*Judgment reversed.*

---

## LARKIN v. PAUGH ET AL.

CERTIORARI TO THE SUPREME COURT OF NEBRASKA

No. 137.   Argued December 9, 1927.—Decided April 9, 1928.

1. Rev. Stats., § 2448, providing that where a patent for " public
   lands " shall issue in pursuance of any law of the United States,
   to a person who has died before the date of the patent, the title
   shall inure to, and become vested in, the " heirs, devisees, or
   assignees " of the deceased patentee as if the patent had issued to
   him during life, *held* applicable where an Indian holding land by
   " trust patent " under the General Allotment Act, applied to the
   Secretary of the Interior, under the Act of March 1, 1907, for a

fee simple patent, and the patent was issued some days after the Indian's death. P. 437.

2. Whether the term "public lands" applies to allotments held in trust for Indians, depends upon the nature and object of the particular statute in which the term is employed. P. 438.

3. Rev. Stats., § 2448, is highly remedial, and patents to Indians are not less within its reason than patents to white men. P. 438.

4. By reason of this statute, the fee simple patent operated to invest the Indian's heirs, devisees or assignees with the title and to divest the United States of it, as if the patent had issued to him during life; and the recipients of the title took it as though from him directly and not as immediate grantees of the United States. P. 438.

5. Issuance of the patent terminated the prior trust and the incidental restriction on alienation, and also the authority possessed by the Secretary of the Interior by reason of them, so that all questions pertaining to the title became subject to examination and determination by the courts,—appropriately those in the State where the land was situate. P. 439.

6. Therefore, the proper state court had jurisdiction to determine that a contract to sell the land, made by the Indian in anticipation of the patent, was valid and that, by reason of its partial performance while the Indian was living, his vendee became an assignee and the contract legally and equitably enforcible as against the heirs. The heirs have no federal right to have the judgment re-examined and vacated on a collateral attack. P. 439.

Affirmed.

CERTIORARI, 275 U. S. 507, to a judgment of the Supreme Court of Nebraska, which reversed a decree canceling a deed made by the administrator of the estate of a deceased Indian.

Mr. Jay A. Larkin, pro se.

Mr. Karl J. Knoepfler, with whom Messrs. Edwin J. Stason and E. S. Ripley were on the brief, for respondents.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This case presents a controversy over the title to land which in 1901 was allotted to Lewis Greyhair, a Winne-

bago Indian, and for which in 1902 he received a trust patent. The suit was brought in the district court of Thurston County, Nebraska, where the land lies. The plaintiff claimed under a deed from the allottee's heirs, and the defendants under a deed from his administrator. In the district court the plaintiff prevailed, but in the Supreme Court of the State the decision was for the defendants. The case was brought here on writ of error; but we dismissed that writ and granted a writ of certiorari, because the only federal questions involved relate to the construction and operation of certain congressional statutes, rather than to their validity, Judicial Code, § 237, as amended February 13, 1925, c. 229, 43 Stat. 936.

The land was allotted to Greyhair under the act of February 8, 1887, c. 119, 24 Stat. 388, which provided in § 5 that the trust patent should declare, as in fact it did, that the United States would hold the land for the period of 25 years in trust for the sole use and benefit of the allottee, or, in case of his decease, of his heirs according to the laws of the State, and at the expiration of that period would convey the same by patent to the allottee, or his heirs, in fee, discharged of such trust and free from all charge or incumbrance. The act further provided in the same section that any conveyance of the land, or contract touching the same, made before the termination of the trust period should be absolutely null and void.

These provisions were qualified by a later one in the act of March 8, 1906, c. 2348, 34 Stat. 182, authorizing the Secretary of the Interior, " whenever he shall be satisfied that any Indian allotee is competent and capable of managing his or her affairs," to terminate the trust period and the incidental restriction against alienation by issuing to such allottee a patent in fee simple; and they were further qualified by a provision in the act of March 1, 1907, c. 2285, 34 Stat. 1018, permitting an allottee to sell all or

any part of his allotment during the existence of the restriction against alienation, if the Secretary of the Interior approved.

March 12, 1916, Greyhair made written application for the issue to him of a fee simple patent under the provision in the Act of 1906, and as reasons therefor he set forth with some corroborative detail that in point of education, experience and habits he was well able to manage his own affairs; that he was in poor health and in need of money; that the land was worth $3,600 and was the only property owned by him which readily could be sold; and that he was not residing on it but on other property belonging to him. The superintendent of the Winnebago Agency approved the application and forwarded it to the Indian Office in Washington with a statement giving the value of the land as $3,200, confirming what Greyhair said of himself and adding: " Greyhair is a very sick man in need of hospital care and special medical attention that we are not able to give him. He needs money and needs it at once. The quickest way we know to get it is to ask the Office to grant a patent in fee on his allotment."

A month later Greyhair, being without response to his application, sent a telegram to the Indian Office saying: "Am sick. Need hospital attention. Am without means until I get patent to allotment. Superintendent informs me that he has asked for quick approval of application that I may get treatment. Please hasten and answer by wire." The Assistant Commissioner then wrote to the superintendent stating that the Indian Office had submitted the application to the Secretary of the Interior with favorable recommendation; that when it was returned by the Secretary the Indian Office would give it immediate attention; and that—" Meanwhile you may make such arrangements as your acquaintance with all the facts in the case justify looking to sale of the allotment

and the assistance of Greyhair to such extent as his necessities may require."

The superintendent received that letter April 29 and immediately informed Greyhair of its contents. Later in the same day Greyhair and his wife, with the approval of the superintendent, entered into a written contract with one Osborn to sell the land to him for $3,520 and to give a deed promptly after the issue of a fee simple patent. Of the agreed purchase price $2,120 was paid when the contract was signed and $1,400 was to be paid when the deed was given. The contract recited that it was made in conformity with the instructions given to the superintendent in the letter of the Assistant Commissioner; and the superintendent endorsed his approval on the contract.

Greyhair died intestate the next day, April 30, leaving as his only heirs his widow and three minor children. A few days later the Secretary of the Interior found from the application and accompanying papers that Greyhair was competent and capable of managing his affairs, and accordingly directed that he be given a fee simple patent as prayed in the application. The patent was issued May 19, 1916.

August 3, 1916, the county court appointed an administrator of Greyhair's estate; and later in that month the administrator brought a suit in equity in a local court of general jurisdiction against the heirs and Osborn, conformably to a local statute,[1] to accomplish specific performance of the contract. Among other things the petition in that suit set forth the contract, disclosed that Greyhair had died the day after making it and showed that a fee simple patent to him was issued after his death. The heirs and Osborn were all brought in by both personal

[1] Com. St. Neb. 1922, c. 15, art. IX; *Solt* v. *Anderson,* 62 Neb. 153, 157; *Solt* v. *Anderson,* 67 Neb. 103, 107.

service and public notice. The widow and Osborn an-
swered and consented that the prayer of the petition be
granted. The children answered through a guardian *ad
litem* and called for full proof. A hearing resulted in
the entry of a decree authorizing and directing the ad-
ministrator, on receiving from Osborn the unpaid balance
of the purchase price, to execute and deliver to him a deed
in fulfillment of the contract. An appeal to the Supreme
Court was admissible under the local law, but none was
taken. The balance of the purchase price was duly paid,
and on April 9, 1917, the administrator executed and de-
livered the deed to Osborn. The latter then entered into
possession and he and his grantees have been in possession
ever since.

May 31, 1922, the heirs of Greyhair—the minors then
having attained their majority—made a deed purporting
to convey the land to the plaintiff, an attorney at law,
who knew of the administrator's deed and of the defend-
ants' claim under it. The deed to the plaintiff recited
a consideration of $1,000 " in hand paid "; but the real
consideration was $80 paid in cash and a conditional prom-
ise to pay $920 more—if and when the plaintiff was ad-
judged by the " court of final jurisdiction " to have the
title.

After receiving the deed from the heirs the plaintiff
brought the present suit to cancel the administrator's deed
and some later conveyances passing all title under it to the
defendants. The plaintiff took the position that Grey-
hair's contract to sell was void because made without the
approval of the Secretary of the Interior and in violation
of the restriction against alienation imposed by the act of
1887; that under that act and other congressional statutes
the title was held in trust by the United States up to the
time of Greyhair's death and then passed to his heirs un-
affected by any act of his; and that his administrator had

no authority over the land and the local court was without jurisdiction to render the decree for the performance of the contract to sell. The trial court sustained that position and accordingly entered a decree of cancellation.

The Supreme Court was of opinion that the fee simple patent, although actually issued after Greyhair's death, should be regarded as if issued during his life, and that, so regarding it, " there could be no question " that the local court " had jurisdiction " to render the decree for the performance of the contract or that the administrator's deed given under the decree " passed a valid title." On these grounds the decree of cancellation was reversed.

It was plainly implied in this decision that the administrator's suit to accomplish performance of the contract was sanctioned by the local statute, and also that, there being full jurisdiction the decree therein was not open to collateral attack and was conclusive on the parties and their privies, including the plaintiff in the present suit who claims under a subsequent deed from the heirs.[2]

The court's conclusion that the patent should be regarded as if issued during the life of Greyhair was rested on the equitable doctrine of relation. We think there is no need to consider that doctrine; for the operation of the patent is controlled by an early congressional statute,[3] still in force, which provides:

" Where patents for public lands have been or may be issued, in pursuance of any law of the United States, to a person who had died, or who hereafter dies, before the date of such patent, the title to the land designated therein

[2] See *Spear* v. *Tidball*, 40 Neb. 107; *Stenberg* v. *State ex rel.*, 48 Neb. 299, 316; *Dowell* v. *Applegate*, 152 U. S. 327, 343, *et seq.; United States* v. *California & Oregon Land Co.*, 192 U. S. 355; *Marin* v. *Augedahl*, 247 U. S. 142, 149, *et seq.*

[3] Act May 20, 1836, c. 76, 5 Stat. 31; § 2448 Rev. Stat.; § 1152, Title 43, U. S. Code.

shall inure to and become vested in the heirs, devisees, or assignees of such deceased patentee as if the patent had issued to the deceased person during his life."

The court noticed this statute, but was of opinion that it " applies to homestead entries and not to Indian allotments." This, we hold, is a mistaken view. The statute was in force long before homestead entries were permitted; and it has been held by this Court to be applicable to patents for Indian selections made under an Indian treaty, *Crews* v. *Burcham,* 1 Black 352, 356, and to patents for Indian allotments made under an Act of Congress, *United States* v. *Chase,* 245 U. S. 89, 101. True, it uses the term " public lands," which seldom is employed as including lands selected for or allotted to Indians. But the term sometimes is used in a sense which includes such lands where the United States has retained the title. This is illustrated in *Kindred* v. *Union Pacific R. R. Co.,* 225 U. S. 582, 596, and *Nadeau* v. *Union Pacific R. R. Co.,* 253 U. S. 442, 444. The question usually is one of intention, considering the nature and object of the particular statute. Here the statute is highly remedial, in that it is designed to relieve from the prior rule that a patent issued after the death of the grantee is inoperative and void. *Davenport* v. *Lamb,* 13 Wall. 418, 427. Patents to Indians are not less within the reason for the statute than patents to white men; and we think its letter may and should be taken as including both, as was done in *Crews* v. *Burcham* and *United States* v. *Chase.*

We conclude that by reason of this statute the fee simple patent to Greyhair, although issued 19 days after his death, operated to invest his " heirs, devisees or assignees " with the title, and to divest the United States of it, " as if " the patent had been issued to him " during life." Of course those who received the title, whether heirs, devisees or assignees, took it as though it came

from him, and not as if they were the immediate grantees of the United States. See *Harris* v. *Bell,* 254 U. S. 103, 108. The statute leaves no room for doubt on this point.

With the issue of the patent, the title not only passed from the United States but the prior trust and the incidental restriction against alienation were terminated. This put an end to the authority theretofore possessed by the Secretary of the Interior by reason of the trust and restriction—so that thereafter all questions pertaining to the title were subject to examination and determination by the courts, appropriately those in Nebraska, the land being there. *Brown* v. *Hitchcock,* 173 U. S. 473; *Lane* v. *Mickadiet,* 241 U. S. 201, 207, *et seq.*

Under the statute the title did not necessarily go to the heirs. Devisees or assignees, if having a lawful claim, would come first; and there well might be a question as to who were the heirs, or whether there were devisees or assignees having a better right. Such questions would be among those which might be taken into the courts. The contention to the contrary is without support in the congressional statutes to which our attention is invited. They all relate to lands held under trust patents or subject to restriction against alienation, and not to such as have been freed from the trust and restriction, as here, by the issue of a fee simple patent.

We are of opinion therefore that there was nothing in the congressional statutes to prevent the local court from taking and exercising jurisdiction of the administrator's suit for specific performance, brought after the issue of the fee simple patent. Of course we accept the ruling of the Supreme Court that there was no want of jurisdiction under the state laws.

As the local court had jurisdiction, that enabled it to decide every question of fact or law arising in the suit, including the questions whether Greyhair's contract to

sell to Osborn was valid or invalid in the circumstances in which it was made, and whether by reason of its partial performance while Greyhair was living Osborn became an assignee in such a sense that the contract legally and equitably might be enforced as against the heirs. These questions inhered in the suit and necessarily were resolved against the heirs by the decree for enforcement. No effort was made to have the decree reviewed or vacated in any direct proceeding. The attack made on it in the present suit was collateral. Certainly there was no federal right to have it reëxamined or vacated on such an attack.

*Judgment affirmed.*