(129 So. 801)

**Succession of WILLIAMS.**
No. 30543.

June 2, 1930.

·Rehearing Denied July 2, 1930.

Earl K. Long, of New Orleans, James P. Guillot, of Derry, and N. E. Simoneaux, of New Orleans (Charles J. Rivet, of New Orleans, of counsel), for appellant.

Borah, Himel & Bloch and Edward Rightor, all of New Orleans, for appellees, executors and universal legatee.

O'NEILL, C. J.

This is a proceeding to fix the amount of the inheritance tax to be paid by the widow as universal legatee of the late Francis Bennett Williams. He died in New Orleans on the 31st of January, 1929, survived by the widow and four sons, and leaving a will in which he gave his entire estate to the widow, and appointed two of the sons executors. The sons waived their right to have the legacy reduced to the disposable portion of the estate.

On the petition of the executors an inventory was made, amounting to $544,557.26, consisting entirely of the half interest of the deceased in the community property. Thereafter the executors brought this proceeding by rule against the inheritance tax collector to have the amount of the inheritance determined. They averred that the estate was thoroughly solvent, that there was therefore no necessity for prolonging their administra-

tion, and that they desired to pay the inheritance tax and deliver the estate to their mother as universal legatee. They annexed to their petition a detailed statement and list of liabilities, amounting to $112,150.56, which, deducted from the amount of the inventory, $544,557.26, showed the net value of the estate to be $432,406.70; on which they computed the inheritance tax, amounting to $13,122.50. The inheritance tax collector and the universal legatee, who was made a party defendant in the rule, were ordered to show cause why the inheritance tax should not be fixed at the sum of $13,122.50. The universal legatee did not answer or oppose the rule. The inheritance tax collector, having asked for and obtained an additional delay of thirty days in which to investigate matters, answered that the net value of the community property was $9,306,578.09, making the half of it belonging to the deceased worth $4,653,289.05, and that the inheritance tax computed thereon would amount to $139,298.67. He averred that the inventory and the statement annexed to the petition of the executors were not true or correct; that the inventory showed that only 6,750 shares of the capital stock of the corporation styled Williams, Incorporated, belonged to the community, whereas all of the capital stock of the corporation belonged to the decedent, whether standing in his name or in the name of his wife, or in the name of his sons; that the Williams, Incorporated, was merely a holding corporation, organized for the purpose of receiving and administering the entire estate of the decedent, except the residence, household effects, and an insignificant amount of cash, stocks and bonds; that the corporation was conceived and organized by the decedent with the hope of evading the just amount of inheritance tax which the state should collect from one of her wealthiest citizens; that after the

transfer of his property to the corporation the decedent continued to administer and control it, to exercise all rights of ownership of it, to make alienations of it, both by onerous and by gratuitous titles, and otherwise to deal with the property with the same freedom and to the same extent as before the transfer of it to the corporation. The inheritance tax collector made the further contention that certain debts, amounting to $26,050, and appearing on the statement annexed to the petition of the executors as deductions from the value of the decedent's half of the community property, should be deducted from the value of the whole of the community estate; and that three other charges appearing on the statement annexed to the petition of the executors, being $7,500 for the Community Chest subscription, $13,848.17 for the income tax, and $146,366.51 for excess of withdrawals from the Williams, Incorporated, should be stricken from the list of debts of the decedent. The inheritance tax collector made the alternative allegation, "only in the event that the court should fail to find that all of the stock of the Williams, Inc., belonged to the community between the decedent and his surviving spouse," that she had standing in her name, or in her possession, or under her control, community property worth approximately $425,000, which the executors should have her account for, so that the inheritance tax might be levied on it. He averred that he was entitled to have the executors furnish a true and complete list of the community property, and of the separate property of the decedent, if any there was; and that his (the inheritance tax collector's) right should be reserved to traverse such statement when filed. He prayed that the rule obtained by the executors should be dismissed at their cost, or, in the alternative, that the inheritance tax should be fixed at $139,298.67, plus 1 per cent.

per month beginning six months after the 31st of January, 1929, and 2 per cent. per month from the 31st of January, 1930, or, again in the alternative, that the inheritance tax should be fixed at such amount as a full investigation might disclose to be justly due, with interest thereon as stated. Ten days later, the inheritance tax collector filed what he called a "supplemental traverse and return to the rule" taken by the executors, and averred that, subsequent to the filing of his original return, he had been informed and believed that the decedent owned numerous bonds, of enormous value, which he had distributed in the bank boxes of his sons, under an understanding that at his death the bonds should become the property of the custodians, respectively, and that the decedent remained the owner of the bonds as long as he lived; that he (the inheritance tax collector) was informed and believed that the decedent had stated on numerous occasions that he had arranged or was arranging his estate so that the state would not be able to collect much of an inheritance tax; that the scheme of transferring property to Williams, Inc., and that of distributing the bonds referred to were not the only methods adopted by the decedent to evade the inheritance tax; that he (the inheritance tax collector) was informed and believed that the value of the estate exceeded $20,000,000; that he had no means of ferreting out the truth, but that the executors should be required to make a full and complete report of the manipulations which the estate had been subjected to during the lifetime of the decedent. The prayer of the supplemental traverse and return was that the rule taken out by the executors should be dismissed, that they should be ordered to file a full and complete return of all of the property belonging to the succession, wherever and however concealed, and that

the inheritance tax should be fixed only after a full investigation.

The widow, as universal legatee, filed a petition and calculation showing that the inheritance tax, according to the figures furnished by the executors, had been erroneously computed by them at $13,122.21, whereas the result of a correct calculation was $13,037.41; which amount she tendered and asked to be allowed to deposit in the registry of the court. The judge ordered, ex parte, that the $13,037.41 should be deposited in the registry of the court, "for the account of the inheritance tax collector, and subject to the further orders of the court." The deposit was made accordingly.

Before the case went to trial, a pleading was filed on behalf of the executors, and on behalf of the universal legatee and her four sons individually, in which they excepted and pleaded that the inheritance tax collector had no cause of action to claim any greater amount as an inheritance tax than the amount which had been deposited in court for his account; and, in amplification of the plea, they pleaded specifically: First, that, if the inheritance tax collector based his claim upon Act No. 109 of 1906, which, as amended by Act No. 42 of 1912, was the only inheritance tax law in force when the donations complained of were made by Mr. Williams to his wife and to his sons, respectively, there was no provision for taxing donations inter vivos, or requiring an account of them; and, second, that, if the inheritance tax collector based his claim upon Act No. 127 of 1921 (Ex. Sess.), an application of the statute to the donations which were made by the decedent, years before the statute was enacted, would be violative of the Fourteenth Amendment of the Constitution of the United States, and of the second section of article 1 and the fifteenth section of article 4 of the Constitution of Louisiana 1921, in that it would be a denial of the equal protection of the laws, and a taking of property without due process of law, and would be confiscatory, in that it would give the law the retroactive effect of divesting vested rights.

The inheritance tax collector filed a motion to reject or strike from the record this so-called exception of no cause of action, on the ground that replication and rejoinder in pleadings were forbidden by article 329 of the Code of Practice, that the universal legatee, being a defendant in the rule, could not urge such a plea against the codefendant, and that the sons who were not originally parties to the rule could not set up such a plea by way of intervention. The motion was denied; whereupon the inheritance tax collector petitioned this court for writs of certiorari, prohibition and mandamus, which were denied, on the ground that the complaint could be urged on appeal.

The civil district court, after hearing the evidence, decided in favor of the executors, making the rule on the inheritance tax collector absolute, and ordering him to accept in full payment of the inheritance tax the amount deposited in the registry of the court. The inheritance tax collector has appealed from the decision.

Counsel for the appellant, inheritance tax collector, have devoted their arguments to four separate and distinct subjects of complaint, viz.: First, that the judge should not have overruled the motion to reject, or to "strike from the record," as the motion reads, the so-called exception of no cause of action; second, that the inventory made at the instance of the executors was not "a true and faithful inventory," and particularly in that it did not contain, in the category of commu-

nity property, a list of the property standing in the name of the decedent's wife; third, that the decedent's organizing of the corporation styled Williams, Incorporated, and transferring his property to it, at the same time retaining full control and exercising the rights of ownership of it, and the issuing of certificates of stock to his four sons, did not have the effect of a division of the property so as to save it from the inheritance tax as a part of the decedent's estate; and, fourth, that the depositing of the amount claimed by the universal legatee to be the correct amount of the inheritance tax due by her into the registry of the court was not equivalent to a tender of the amount to the clerk of court in his capacity of inheritance tax collector, ex officio, so as to stop the interest, or prevent its accruing.

1. The judge was right in refusing to "strike from the record" the so-called exception of no cause of action. As a matter of academic discussion, it may be conceded that the plea was improperly called an exception of no cause of action; that a plaintiff has no right to set up an exception of no cause of action against the defendant's answer, that a defendant has no right to set up the exception against a codefendant and that an intervener has no right to set up the exception against a defendant in the suit. But that is a matter of no importance in this case. The executors and the universal legatee had the right to file the plea, by whatever name it might have been called, in order to plead that the statute which they believed the inheritance tax collector was relying upon would be violative of both the Constitution of the United States and the Constitution of this state if the statute were given a retroactive effect against donations made previous to the enactment. It was not entirely improper to call the plea one of no cause of action, in the sense that it was set up in bar of the claim of the inheritance tax collector for a tax computed upon the value of property which had been donated by the decedent previous to the enactment of the statute which the inheritance tax collector had to rely upon. But the calling of the plea an exception of no cause of action, even if not technically accurate, would not have justified ordering the plea stricken from the record.

2. Appellant's complaint that the inventory filed in this succession was not a compliance with the requirement of the seventeenth section of Act No. 127 of 1921 (Ex. Sess.), as amended by Act No. 44 of 1922, p. 81, § 2, "that every executor must cause a true and faithful inventory to be taken by a notary public, in the manner prescribed by law," is subdivided into two complaints, viz.: First, with regard to the household furniture and effects in the residence of the decedent, the notary public and the appraisers, instead of going to residence and listing each item with their appraisal of it, used and were governed by an inventory which had been previously by the American Appraisal Company; and, second, that the notary and appraisers did not include in the inventory, as community property, the stocks and bonds standing in the name of Mrs. Williams, amounting to $378,808.25, and a credit appearing as due her on the books of the Williams, Incorporated, amounting to $173,013.98.

As to the method of making the inventory of the household furniture and effects, it is true that it was not made in the way intended by the law; but it is not contended that the inventory was not a "true and faithful inventory," in the sense that the valuation put upon any article was less than its actual value, or in the sense that any item (except the stocks and bonds and credit standing in the name of Mrs. Wil-

liams) was omitted from the inventory. It appears that a loving cup, which was given to Mr. Williams in appreciation of one of his public benefactions, was omitted accidentally from the inventory. The cup cost the giver about $150, but its commercial value, after it was inscribed and given, must have been so small—in comparison with its sentimental value, and in comparison with the inventory of $544,557.26—that we would not upset the decree of the district court on account of that omission. With that exception, every article in the residence of the deceased was checked against the inventory by Mrs. Williams and one of her sons, and there was nothing else omitted from the inventory. The total value of all of the household furniture and effects, according to the inventory, was $35,628.31; and no attempt was made by the inheritance tax collector to show that any article was undervalued. The allegation, in the supplemental traverse or return of the the inheritance tax collector, that he was informed and believed that the decedent had concealed stocks and bonds of enormous value in the bank boxes of his sons, was not sustained by proof or an offer of proof, and is not referred to in appellant's brief. The evidence shows conclusively that there was no concealment of any stocks or bonds or other property belonging to the decedent, by him or by his executors or the universal legatee, or by any one else. The executors invited the attorneys for the inheritance tax collector to have an examination and audit made of the books of the Williams, Incorporated; and they employed an auditor who made a thorough examination before they filed their return or traverse of the rule to fix the inheritance tax. There was no obligation on the part of the executors to include in the inventory, as community property, the stocks and bonds and credit standing in the name of Mrs. Wil-

liams and amounting to $551,822.23. There was no concealment of that property, and the inheritance tax collector was given ample opportunity to show that it was not the separate property of Mrs. Williams, if in fact it was not her separate property. An inventory of the property of a succession is not conclusive, as to either the value or the ownership of the property. Succession of Dean, 33 La. Ann. 867. The evidence in this case shows conclusively that the stocks and bonds and credit standing in the name of Mrs. Williams, amounting to $551,822.23, were her separate property. The decedent gave her 102 shares of the capital stock of a corporation styled F. B. Williams Cypress Company, in 1903, and gave her 100 shares as a Christmas present, in 1912. The certificates were issued to her, respectively, in May, 1903, and December 26, 1912. The charter of the corporation was amended on the 29th of December, 1922, so as to increase the capital stock from 2,500 to 60,000 shares, and a stock dividend of 2,000 per cent. was declared, giving Mrs. Williams an additional 4,040 shares, and making her total holdings 4,242 shares, which remained in her possession until November, 1927, when all of the stockholders of the F. B. Williams Cypress Company transferred their stock to the Williams, Incorporated, except that each stockholder retained one share of stock in the F. B. Williams Cypress Company. Mrs. Williams, therefore, transferred to the Williams, Incorporated, in November, 1927, 4,241 shares of stock in the F. B. Williams Cypress Company, and received credit on the books of the Williams, Incorporated, for $424,778.56, the price of her stock in the F. B. Williams Cypress Company; and it is admitted that the credit of $173,013.98 due her according to the books of the Williams, Incorporated, at the date of the death of her husband, was the balance

of the credit of $424,778.56, which she had received in November, 1927. The stocks and bonds standing in her name were bought by her, from time to time, with a part of the money which she received credit for on the books of the Williams, Incorporated, in November, 1927.

■■ The donations made by the decedent to his wife, in 1903 and 1912, of the shares of stock in the F. B. Williams Cypress Company, were valid donations. In fact, their validity is not attacked in this proceeding. A man may give to his wife, or a woman to her husband, either by marriage contract or during the marriage, "all that he or she might give to a stranger." Rev. Civ. Code, art. 1746. Such a donation may be revoked at any time during the lifetime of the donor, but becomes irrevocable at his or her death. Rev. Civ. Code, art. 1749. A donation of community property made by the husband to the wife is valid, because the wife alone has the right to complain of a violation of article 2404 of the Revised Civil Code, which forbids the husband to make a donation of community property, and when she consents the donation is valid. Snowden v. Cruse, 152 La. 144, 92 So. 764. Mrs. Williams had the possession and administration of her stocks and bonds, and, on the advice of her husband or of one of her sons, made her own investments; the profits and accumulations of which are her separate property.

3. The corporation styled Williams, Incorporated, was organized on the 22d of May, 1906, with a capital stock of $500,000, represented by 5,000 shares of the par value of $100. Two certificates, one for 5 shares and one for 4,496 shares, were issued to Francis B. Williams, the decedent, and a certificate for one share was issued to each of his four sons. On the same day, Francis B. Williams

transferred the 4,496 shares to his sons, and indorsed and delivered the certificate to them, so that each son received by the donation 1,124 shares of stock. The certificate for 4,496 shares was surrendered and canceled, and a new certificate for 1,124 was issued to each of the four sons. The certificates were issued on the 6th of June, 1916. Photostatic copies of the certificates are in the record. In 1922, the capital stock was increased to 85,000 shares, or $8,500,000 and a stock dividend of 1,250 per cent. was declared; so that each son thereby acquired 14,062½ shares and Francis B. Williams acquired 6,250 shares. Of the 85,000 shares, therefore, each son owned 15,187½ shares, and Francis B. Williams owned the 6,750 shares appearing on the inventory in this succession.

At the time of the issuance of the original stock, Francis B. Williams transferred to the corporation at the price of $500,000 property, stocks, bonds, etc., which were valued on the books of the corporation at $4,165,111.69. He was president of the corporation and he and his sons constituted the board of directors. At the first meeting of the board the Whitney-Central National Bank, in which Francis B. Williams kept his own account, was named as the depositary of the corporation; and when he transferred the property to the corporation he received the corporation's check on that bank for $500,000, and at the same time gave his check on the same bank for $499,600 for the 4,996 shares of stock which he received, and each of his sons gave his check for $100. By a clause in the charter of the corporation, the president was vested with the power, without the authorization of the board of directors, to purchase stocks, bonds, and other property, real or personal, for the corporation, and to sell, mortgage, pledge or otherwise dispose

of the same; to issue notes, drafts and checks, to sign all contracts, and to vote all stock held by the company in other corporations at all stockholders' meetings. It was provided that the authority so conferred upon the president might, with his consent and the authority of the board of directors, be vested in any other officer or director, temporarily or for a particular occasion. The president's salary, for 1916 to 1918, inclusive, was $60,000 per year; for 1919 and 1920 was $40,000 per year; for 1921 was only $10,000; for 1922 and 1923 was $35,000 per year; and thence until the end of 1928 was $100,000 per year. These salaries were approved by the federal authorities, in the matter of the income tax paid by the Williams, Incorporated, as a deduction for operating expenses; and Francis B. Williams individually accounted for the salaries in his income tax returns and settlements. The minutes and the records show also that the sons retained their stock, collected the dividends, and accounted for them regularly in their income tax returns and settlements.

The organization of the corporation was not a sham, in any sense. It acquired the holdings of other corporations of which Francis B. Williams and his family were the stockholders, and has continued to be a going concern, conducting its business on a large scale, according to the ordinary and customary methods of such concerns, and independent of the affairs of the stockholders.

It is not true that the property which Francis B. Williams transferred to the Williams, Incorporated, in 1916, continued in reality to be his property. It is true that the organization of the corporation and distribution of the stock, in 1916, had the effect of a donation by Francis B. Williams to his sons of the major part of his estate. The question, therefore, is whether the value of the

property or stock donated in 1916 can be taken into consideration in computing the inheritance tax on the estate of the donor, whose death occurred in 1929. The only law imposing an inheritance tax, in 1916, was Act No. 109 of 1906, p. 173, as amended by Act No. 42 of 1912, p. 50, which imposed the tax only "on all inheritances, legacies and other donations mortis causa." There was then no tax on donations inter vivos, nor law requiring such donations to be explained or accounted for, in computing the tax on inheritances, legacies or donations mortis causa. The first inheritance tax law that made any reference to donations inter vivos was Act No. 51 of 1918, p. 75, § 3, which amended section 18 of Act No. 109 of 1906, by adding thereto that all donations or transfers of property for an inadequate consideration, made within 90 days previous to the death of the donor or transferor, should be presumed to have been made in avoidance of the inheritance tax, and that, unless the presumption should be overcome by sufficient evidence, the property donated or transferred should be deemed a part of the estate of the donor or transferor, for the purpose of computing the inheritance tax due by his succession, his heirs or his legatees.

That statute would not be applicable to this case if it had been enacted before the donation complained of was made, because the donation was not made within the 90 days immediately preceding the death of the donor. The first statute levying a tax on "donations and gifts made in contemplations of death" was Act No. 127 of 1921 (Ex. Sess.) p. 323, which, as to sections 7 and 17, was amended by Act No. 44 of 1922, p. 80, §§ 1, 2. The act of 1921 (section 18) requires that all donations and transfers of property for an inadequate consideration, made within the year preceding the death of the donor

or transferor, shall be separately listed on the inventory or sworn statement, and shall be presumed to have been made in contemplation of death and in avoidance of the tax therein levied, and that unless the presumption shall be overcome by sufficient evidence the property shall be deemed a part of the estate of the donor or transferor for the purpose of computing the inheritance tax due by his succession, his heirs or legatees; and the statute provides that any such donation or transfer made previous to the year preceding the death of the donor or transferor may be inquired into, and that, if such donation or transfer is shown to have been made in contemplation of death and in avoidance of the tax, the donation or transfer shall be subject to the tax.

■■ Statutes levying taxes on donations or transfers made in contemplation of death are never construed as applying to transactions that were completed before the law was enacted. It was so decided in Shwab v. Doyle, 258 U. S. 529, 42 S. Ct. 391, 66 L. Ed. 747, 26 A. L. R. 1454, with reference to the Act of Congress of September 8, 1916 (39 Stat. 777), the first estate tax act. And it has since been held that to give such a statute the retroactive effect of taxing transfers made previous to the enactment of the law would amount to confiscation and be violative of the Fourteenth Amendment of the Constitution of the United States. Nichols v. Coolidge, 274 U. S. 531, 47 S. Ct. 710, 71 L. Ed. 1185, 52 A. L. R. 1081; Blodgett v. Holden, 275 U. S. 144, 48 S. Ct. 105, 72 L. Ed. 206; Untermeyer v. Anderson, 276 U. S. 439, 48 S. Ct. 353, 72 L. Ed. 645. A statute which undertakes to tax donations or transfers made within a specified number of years previous to the death of the donor or transferor, as being conclusively presumed to have

been made in contemplation of death, is violative of the Fourteenth Amendment in so far as it undertakes to tax a donation or transfer made within that period but in fact not made in contemplation of death. Schlesinger v. Wisconsin, 270 U. S. 230, 46 S. Ct. 260, 70 L. Ed. 557, 43 A. L. R. 1224.

■ The presumption established by Act 127 of 1921, that all donations, or transfers of property for an inadequate consideration, if made within the year previous to the death of the donor or transferor, are made in contemplation of death, is, of course, not applicable to the donation made by Francis B. Williams to his sons in 1916, or to the donations made to his wife in 1903 and 1912, respectively, because those donations were not made within the year previous to the death of the donor. And our conclusion is that the provisions of the act levying a tax on donations and transfers made in contemplation of death, and providing that donations and transfers made previous to the year preceding the death of the donor or transferor may be inquired into for the purpose of ascertaining whether they were made in contemplation of death, cannot apply to the donation made by Francis B. Williams to his sons in 1916, or to the donations made to his wife in 1903 and 1912, respectively.

■ 4. We do not find any merit in appellant's complaint that the amount of the tax which the executors and the universal legatee admitted was due was deposited in the registry of the court instead of being paid or tendered to the inheritance tax collector. The amount was deposited with the clerk of court, who is ex officio inheritance tax collector, and was deposited "for the account of the inheritance tax collector."

The judgment is affirmed.