**UNITED STATES of America,
Plaintiff,**

v.

**Peter BRUISEDHEAD and Genevieve Bruisedhead, his wife, Ethel Leech, and A. E. Leech Company, a Montana Corporation, Defendants.**

**Civ. No. 2515.**

United States District Court
D. Montana,
Great Falls Division.

Jan. 7, 1966.

Moody Brickett, U. S. Atty., Butte, Mont., and Arthur W. Ayers, Jr., Asst. U. S. Atty., Billings, Mont., for plaintiff.

Jardine, Stephenson, Blewett & Weaver, Great Falls, Mont., for defendants Ethel Leech and A. E. Leech Co.

JAMESON, District Judge.

Plaintiff seeks to quiet title in the United States, in trust for the Blackfeet Tribe of Indians of Montana, to all minerals in an 80 acre tract of land located on the Blackfeet Reservation,[1] and to amend a patent issued to the defendant Peter Bruisedhead [2] to include a reservation of the minerals. The defendants Peter Bruisedhead and Genevieve Bruisedhead, his wife, are in default. Their successors in interest, the defendants Ethel Leech and A. E. Leech Com-

---

1. This tract is described as E½ of the SW¼ of Section 11, T. 31 N., R. 6W., M.P.M.

2. The patent was issued to *Peter Bruisedhead.* In subsequent instruments, including a conveyance to the defendant Ethel Leech, the name appears as Peter Bruised Head.

**1000**

pany, and the plaintiff have respectively moved for summary judgment on an agreed statement of facts. This court has jurisdiction under 28 U.S.C. 1345.

On August 11, 1922, pursuant to the provisions of the Act of June 30, 1919 (41 Stat. 3, 16–17),[3] a restricted patent was issued to Minkwoman Runningrabbit, Blackfeet Allottee No. 903, as a homestead. The patent contains a restriction against alienation "until Congress shall otherwise direct", and reserves "to the United States, in accordance with the provisions of the Act of June 30, 1919 (41 Stat. 17), all minerals, including coal, oil and gas, for the benefit of the Blackfeet Tribe of Indians, until Congress shall otherwise direct."

In addition to the 80 acre homestead, Minkwoman Runningrabbit was allotted 320 acres in 1918. No part of the 320 acre tract is involved in this proceeding.

Minkwoman Runningrabbit died in April, 1917. Her estate was probated by the Department of the Interior, and an order determining the defendant Peter Bruisedhead to be Runningrabbit's sole heir was entered on December 13, 1921.

On June 2, 1924, Public Law No. 173 (43 Stat. 252) was enacted. This statute provided:

"That the allotments of Blackfeet Indians designated as homesteads under section 10 of the Act of June 30, 1919 (Forty-first Statutes at Large, page 16), imposing restrictions on alienation, shall after the death of the original allottee be subject to partition, sale, issuance of patents in fee, or any other disposition authorized by existing law relating to Indian allotments."[4]

On August 22, 1925, a fee patent (No. 965485) covering both the 80 acre tract and the 320 acres not involved here was issued to "Peter Bruisedhead, heir of Minkwoman Runningrabbit, an Indian of the Blackfeet Tribe." This patent contains neither a restriction against alienation nor a mineral reservation.

On April 24, 1947, Peter Bruisedhead and his wife executed a warranty deed to the 80 acre tract to the defendant Ethel Leech, reserving "six and one-fourth (6¼) per cent of the land owners royalty in the oil, gas, or other minerals in and under, produced and saved from said premises." On May 14, 1963, Mrs. Leech conveyed the tract by warranty deed to the defendant A. E. Leech Company.

The Government contends that notwithstanding the absence of any mineral reservation in the 1925 fee patent issued to Peter Bruisedhead, the minerals in the 80 acre tract remained in the United States in trust for the Blackfeet Tribe and did not pass to Bruisedhead upon issuance of the fee patent. The defendants Ethel Leech and A. E. Leech Company contend that the congressional authorization to issue a patent in fee contained in the Act of June 2, 1924, "gave the Secretary authority to convey a fee

---

3. This statute provides in pertinent part: "* * * the Secretary of the Interior is authorized to make allotments under existing laws within the said reservation to any Indians of said Blackfeet Tribe not heretofore allotted, * * * Provided, That of the lands so allotted eighty acres of each allotment shall be designated as a homestead by the allottee and be evidenced by a trust patent and shall remain inalienable and nontaxable until Congress shall otherwise direct: * * * Provided further, That any and all minerals, including coal, oil, and gas, are hereby reserved for the benefit of the Blackfeet Tribe of Indians until Congress shall otherwise direct, and patents hereafter issued shall contain a reservation accordingly: * * *"

4. The Act of June 4, 1953, 67 Stat. 42, repealed the Act of June 2, 1924, and amended the proviso in 41 Stat. 3, 16 to read as follows:
"That of the lands so allotted eighty acres of each allotment shall be designated as a homestead allotment by the allottee, and shall be evidenced by a trust patent, which shall be subject to sale, partition, issuance of patent in fee, or other disposition in accordance with the laws relating to the other allotments on the Blackfeet Reservation and shall be nontaxable as long as held in a trust or restricted status."

simple estate which included the minerals in and under the land." Such an estate, they argue, was conveyed to Bruisedhead by the 1925 patent.

The parties agree that the fact that Minkwoman Runningrabbit died before the issuance of the trust patent to her in 1922 did not prevent Bruisedhead, as her heir, from taking title to the property. Runningrabbit, having been allotted 320 acres in 1918 was entitled, under the terms of the Act of June 30, 1919, to receive a homestead allotment as an Indian "who [had] been allotted or may be entitled to rights within said reservation."

In Larkin v. Paugh, 1928, 276 U.S. 431, 48 S.Ct. 366, 72 L.Ed. 640, an Indian allottee died before a fee patent to his allotment was issued. The Court held that the operation of the patent was controlled by 43 U.S.C. 1152 which provides:

> "Where patents for public lands have been or may be issued, in pursuance of any law of the United States, to a person who has died [or who hereafter dies] before the date of such patent, the title to the land designated therein shall inure to and become vested in the heirs, devisees, or assignees of such deceased patentee as if the patent had issued to the deceased person during life."

In construing this statute the Court stated:

> "We conclude that by reason of this statute the fee-simple patent * * * operated to invest his [the allottee's] 'heirs, devisees or assignees' with the title, and to divest the United States of it, 'as if' the patent had been issued to him 'during life.' Of course those who received the title, whether heirs, devisees or assignees, took it as though it came from him, and not as if they were the immediate grantees of the United States. See Harris v. Bell, 254 U.S. 103, 108, 41 S.Ct. 49, 65 L.Ed. 159. The statute leaves no

room for doubt on this point. (276 U.S. 438–439, 48 S.Ct. 368)." [5]

■■ Accordingly the sole question at issue is whether the fee patent to Bruisedhead operated as a valid conveyance of the minerals. Obviously in the absence of a restriction or reservation a fee simple patent covers the minerals as well as the surface rights. Did the reference to "patents in fee" in the Act of June 2, 1924, authorize the issuance of a fee patent without reserving the minerals? It is my conclusion that it did not. This Act merely removed the restriction against alienation found in the Act of June 30, 1919, and did not authorize a conveyance of the minerals.

The Act of June 30, 1919, plainly required that the trust patents issued pursuant thereto contain a reservation of the minerals for the benefit of the Blackfeet Tribe of Indians. The effect of statutes requiring a reservation of minerals was considered in British-American Oil Producing Co. v. Board of Equalization of State of Montana, 1936, 299 U.S. 159, 164–165, 57 S.Ct. 132, 134, 81 L.Ed. 95, where the Court stated:

> "The issue of the trust patents containing, as the statute requires, a reservation for the benefit of the tribe of all minerals, including oil and gas, in or under the allotted land, operates to carve out of such land and create a distinct estate consisting of the minerals. This estate is in itself land, and, being reserved for the benefit of the tribe, it is tribal land, and is unallotted."

It is thus clear that the allotment to Minkwoman Runningrabbit never included the minerals in the 80 acre tract.

Peter Bruisedhead's right to receive title to the allotment was a right of heirship, and he received title to the property as an heir of Minkwoman Runningrabbit and not as an immediate grantee of the United States. Larkin v. Paugh, supra. As an heir Bruisedhead took title only to the interests allotted. These interests

5. See also State of Oklahoma ex rel. Commissioners of Land Office v. United States, 10 Cir. 1946, 155 F.2d 496, 499.

did not include the minerals since there had been no allotment of the minerals under the Act of June 30, 1919.

An analysis of the language of the Act of June 2, 1924, supports the conclusion that Peter Bruisedhead was not entitled to and did not receive title to the minerals in the 80 acre tract. That act applied only to "the allotments of Blackfeet Indians designated as homesteads under section 10 of the Act of June 30, 1919 * * *," and as pointed out above, Minkwoman Runningrabbit's allotment did not include the minerals.

The Act of June 2, 1924, does remove "restrictions on alienations" and provide for the issuance of patents in fee after the death of the original allottee. A section of the general Indian Allotment Act, 25 U.S.C. 348, similarly contains a provision for the conveyance of allotments by patent in fee upon the expiration of the trust period. In United States v. Frisbee, D.Mont. 1944, 57 F.Supp. 299, 300, the late Judge Pray of this court interpreted the effect of the Act of June 30, 1919, upon the General Allotment Act. He held that the Act of June 30, 1919 became a part of the General Allotment Act "and that *all fee simple patents* subsequently issued were required to contain a reservation" of minerals for the benefit of the Blackfeet Tribe of Indians. (Emphasis added.) A patent which had been issued without the required reservation was not lawful and conveyed no interest in the minerals.

Judge Pray's reasoning is equally applicable in the instant case. Both the General Allotment Act and the Act of June 2, 1924, provided for the issuance of fee patents under certain conditions. I read nothing in the Act of June 2, 1924 which indicates that a fee patent issued under the authority of that act would convey any greater interest than did the fee patent issued pursuant to the General Allotment Act in the Frisbee case. In both instances the effect of the legislation was to remove restrictions on alienation.[6]

The absence of any mention of mineral interests in the 1924 Act, together with the provision allowing the issuance of a fee patent, cannot be read as negating the express provisions of the Act of June 30, 1919, requiring a reservation of minerals for the benefit of the Tribe. There is no special significance in the term "fee" found in the 1924 Act and the patent to Bruisedhead. Many fee simple patents issued by the United States to lands on the Blackfeet Reservation contain reservations of mineral interests.[7] Moreover, the patent to Bruisedhead itself contains a specific reservation for ditches or canals constructed by the authority of the United States.

The fee simple patent to Bruisedhead undoubtedly created in him an alienable

---

6. This is confirmed by reports to both the House of Representatives and the Senate on H.R. 2879, 68th Cong. 1st Sess. Both reports contain a letter from the Secretary of the Interior submitting a draft of the bill which became the Act of June 2, 1924. In referring to Section 10 of the Act of June 30, 1919, the Secretary said in part:

"Under this act approximately 3,500 additional allotments were made and a homestead selection was noted for each living Indian. It will be seen that the law provides that homesteads must remain inalienable and nontaxable unless Congress shall otherwise direct. We are therefore unable to dispose of the homesteads by partition sale, patents in fee, or otherwise, notwithstanding the death of the Indians for whom the designations were made.

"A number of the allottees have died and unless the relief sought is obtained there will be a gradual accumulation of heirship lands on the reservation which the present law will prevent being disposed of for the benefit of the heirs.

"The proposed act will permit of disposing of a homestead after the death of the allottee in the same manner as other trust lands under existing laws." See also Historical Note following 25 U.S.C.A. § 331 at 259–60 (1963).

7. A number of patents on file with the Bureau of Land Management, U. S. Department of the Interior, Billings, Montana, contain such reservations. These patents make specific reference to the order "directing that a fee simple patent issue to the claimant", as does the patent to Bruisedhead. The granting clauses are identical except for the reservations.

title to the interests conveyed. A fee simple patent or title, however, may be subject to reservations. In this instance the fee patent to Bruisedhead was subject to the reservation of minerals required by the Act of June 30, 1919.

The United States is not bound by the patent issued without authority or estopped from asserting its rights in the minerals. The patent did not convey what the law reserved, and all persons were charged with notice of the reservation. United States v. Frisbee, supra, and cases cited at 57 F.Supp. 300. United States v. State of Washington, 9 Cir. 1956, 233 F.2d 811, 817, and cases there cited.

Title should be quieted in the United States to the mineral interests in the 80 acre tract. Pursuant to Rule 11(b) of the local rules of court, plaintiff shall prepare, serve and lodge a draft of judgment.