**UNITED STATES of America,**
Plaintiff,

**Confederated Salish and Kootenai Tribes of the Flathead Reservation, Montana,**
Intervenor,

v.

**Mike VULLES and Vladimir Vulles,**
Defendants.

**No. 1529.**

United States District Court
D. Montana,
Missoula Division.
April 21, 1968.

**830**

Moody Brickett, U. S. Atty., Butte, Mont., for plaintiff.

Wilkinson, Cragun & Barker, Richard A. Baenen and John W. Cragun, of the firm, Washington, D. C., George F. Higgins, Missoula, Mont., for defendants.

Eugene H. Mahoney, Thompson Falls, Mont., for intervenor.

### OPINION

RUSSELL E. SMITH, District Judge.

This opinion involves the right of the individual members of the Confederated Salish and Kootenai Tribes of the Flathead Reservation, Montana, (the Tribe) to use a road in Sanders County, Montana, known as the Vanderburg Trail (the Trail), to gain access to tribal lands from a public highway.[1] This road runs over the lands of the defendants who are the successors in interest of an Indian allotee.

Any rights which the Tribe may claim on behalf of its members as superior to the rights of members of the general public must be rights which existed in the members of the Tribe as individuals prior to patents and which survived the issuance of the patent. The law of Montana does not grant to Indians special rights of way across privately held lands, and once the Indian's title is fully extinguished, state law governs the creation of rights in property.[2] Unless provided by the treaty, no Federal law in existence prior to the extinguishment of the Indian title here gave the Indians as individuals either a general right to wander or a right to select private easements over patented lands.

The Tribe as an intervenor claims that its members have rights to the use of the Trail by reason of the special status accorded them by the Flathead Treaty.[3] Article III of the treaty upon which reliance is placed provides:

"*And provided,* That if necessary for the public convenience roads may be run through the said reservation; and, on the other hand, the right of way with free access from the same to the nearest public highway is secured to them; as also the right in common with citizens of the United States to travel upon all public highways.

The exclusive right of taking fish in all the streams running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing; together with the privilege of hunting, gathering roots and berries, and pas-

---

1. In separate findings and conclusions the court has held that the United States, acting as trustee for the Tribe, has a private easement for the use of the Trail for the management of tribal resources but that there is no public easement for the use of the Trail.

2. Larkin v. Paugh, 276 U.S. 431, 48 S.Ct. 366, 72 L.Ed. 640 (1928).

3. 12 Stat. 975.

turing their horses and cattle upon open and unclaimed land."

Treaty with The Flatheads, July 16, 1855. 12 Stat. 976.

The first paragraph of Article III of the Treaty refers to public roads and does not create any rights in individuals to travel over private lands or to use private roads which have been established over private lands.

Nothing in the evidence indicates that there are any fishing rights involved in this case and the court need not consider any problems created by the fishing rights reserved in the treaty.[4]

The treaty does not specifically reserve any easements for use in connection with berrying and hunting. The right to hunt and gather berries was restricted to open and unclaimed land. Should easements over private land be implied? At the time of the treaty the ownership of all lands was communal and no doubt each Indian had a right to cross the common lands for any purpose. Did this unlimited right to wander survive the treaty, the legislation and the issuance of patents? The treaty itself contemplates the private ownership of land[5] —i. e., that each Indian would sacrifice some of his common rights in the larger area for greatly enlarged rights in a smaller area.

 As trustee for the Tribe the United States had plenary powers to deal with the lands for the benefit of the Indians.[6] The Act of April 23, 1904[7] established the general scheme for the disposal of the reservation lands. That Act contemplated that the reservation be surveyed; that lands be alloted to members of the Tribe in severalty and that the lands not so alloted be opened to settlement and sold. It was contemplated that patents would be issued to Indian allotees and to purchasers of unalloted lands. The proceeds from the sales of surplus unalloted lands were to be held by the United States and expended for the benefit of the Indians. The provisions of the Act of April 23, 1904 have been changed and supplemented but Congress has not altered the basic scheme and lands have been alloted to Indians and sold to purchasers. Was it within the contemplation of Congress that the parts of the reservation which were to be broken up into relatively small irrigated tracts[8] should be subject to the right of Indians to cross those privately held tracts at will in pursuit of game or berries? It is a matter of implications[9] and it appears to the court that the implications favor the right of the landowner to privacy rather than the right of the Indians to wander. The problem here is different from that posed in United States v. Winans, supra. In *Winans* the right to take fish had been preserved by the treaty. Neither the Indians nor the United States acting as trustee conveyed any part of that right. In this case the Indians, acting through their trustee, had conveyed the Vulles lands. Obviously this conveyance extinguished some of the communal rights in that land. The problem is how many? The basic hunting and berrying rights were confined to open and unclaimed land and it would seem that the easements ancillary to the hunting and berrying rights should not be more extensive than the basic rights.

4. Cf. United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).

5. See Article VI.

6. Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1902).

7. 33 Stat. 302.

8. From the beginning a Congressional purpose to irrigate the reservation lands has been indicated and the legislation governing the reservation is replete with references to the irrigation system.

Act of April 23, 1904, 33 Stat. 302; Act of June 21, 1906, 34 Stat. 354; Act of April 30, 1908, 35 Stat. 83; Act of May 29, 1908, 35 Stat. 448 (limiting ownership of irrigated lands to 160 acres); Act of April 4, 1910, 36 Stat. 277; Act of March 3, 1911, 36 Stat. 1066; Act of Aug. 9, 1912, 37 Stat. 265; Act of May 18, 1916, 39 Stat. 139; Act of May 10, 1926, 44 Stat. 464.

9. Winters v. United States, 207 U.S. 564, at 576, 28 S.Ct. 207, 52 L.Ed. 340.

For these reasons the court is of the opinion that the individual members of the Tribe do not have rights to cross the Vulles lands to gain access to the open and unclaimed lands on the reservation.