747 F.2d 1316
 George W. AKOOTCHOOK, Evelyn Gordon, Peter Panruk, and
Stanley McCormick, Plaintiffs-Appellants,
v.
UNITED STATES of America, DEPARTMENT OF THE INTERIOR,
William Clark,* Secretary,
Defendants-Appellees.
 CA No. 83-4181.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 22, 1984.
Decided Nov. 23, 1984.
 
 Craig J. Tillery, Reese, Rice & Volland, Anchorage, Alaska, for plaintiffs-appellants.
 Kathleen P. Dewey, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the District of Alaska.
 Before CHAMBERS, FERGUSON and BEEZER, Circuit Judges.
 BEEZER, Circuit Judge:
 
 
 1
 This appeal concerns the right of Alaska Natives to apply for allotments of land located inside three national wildlife refuges. When the Department of the Interior refused to consider the applications of four Alaska Natives, they filed suit to compel the Department to consider their applications. The district court granted a summary judgment against the applicants, from which they appeal. We affirm.
 
 
 2
 * FACTS AND PROCEEDINGS BELOW
 
 
 3
 Although Native Americans have the right to use and occupy large areas of land, they have no general right to obtain an ownership interest in the land. Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 279-82, 75 S.Ct. 313, 317-19, 99 L.Ed. 314 (1955). In 1906, however, Congress passed the Alaska Native Allotment Act ("the Allotment Act"), ch. 2469, 34 Stat. 197 (1906) (codified as amended at 43 U.S.C. Secs. 270-1 to -3 (1970)), which gave Native Alaskans the right to apply for allotments of "vacant, unapportioned, and unreserved nonmineral land in Alaska." 43 U.S.C. Sec. 270-1 (1970). Although the Allotment Act was repealed in 1971 by the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. Sec. 1617, ANCSA contained a savings clause for applications pending on the date of the repeal of the Allotment Act. Id. Sec. 1617(a). See generally F. Cohen, Handbook of Federal Indian Law, 741-50 (1982).
 
 
 4
 This appeal focuses on lands inside three Alaskan wildlife refuges. Beginning in 1919, these lands were withdrawn by the federal government in a series of Executive Orders. The Alaska National Interest Lands Conservative Act ("ANILCA") consolidated the various withdrawals into three wildlife refuges: the Arctic National Wildlife Refuge, the Kodiak National Wildlife Refuge, and the Yukon Delta National Wildlife Refuge. Pub.L. No. 96-487, Sec. 303(2), (5), (7), 94 Stat. 2390-93 (1980).
 
 
 5
 The plaintiffs in this case are Native Alaskans whose families have used and occupied the lands in question for generations. The Department of the Interior, however, refused to consider their applications for allotments in the various refuges because each applicant's personal use and occupancy had commenced after the land had ceased to be "vacant, unappropriated, and unreserved." Subsequently, the plaintiffs brought this suit in district court to compel the Department to consider their applications.[1] Both sides filed motions for summary judgment. On August 5, 1983, the district court denied the plaintiffs' motion and granted the Government's motion "to the effect that the lands at issue were validly withdrawn as wildlife refuges, and were not available for allotment by individuals whose individual use and occupancy ... began after an effective withdrawal."
 
 II
 ANALYSIS
 A. Ancestral Usage
 
 6
 The plaintiffs contend that they are entitled to apply for allotments based on their ancestor's use and occupancy of the land prior to the creation of the wildlife refuges. In support of this contention, the plaintiffs note that section 2 of the Allotment Act, which authorizes allotments in national forests, requires the application to be "founded on occupancy of the land prior to the establishment of the particular forest." 43 U.S.C. Sec. 270-2 (1970). In Shields v. United States, 698 F.2d 987 (9th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 73, 78 L.Ed.2d 86 (1983), we interpreted that provision to require prior personal occupancy by the applicant and rejected the argument that ancestral usage satisfied the statute. In this case, however, the plaintiffs claim a right to apply for allotments under section 1, rather than section 2. They argue that Congress' failure to place language regarding prior occupancy in section 1 shows that Congress only intended to require prior personal occupancy for claims under section 2.
 
 
 7
 In light of the legislative history of section 2, however, we reject the plaintiffs' argument. Section 2 was added in 1956 as part of a comprehensive amendment of the Allotment Act. Act of Aug. 2, 1956, ch. 891, 70 Stat. 954. The 1956 amendments permitted Native Alaskans to alienate their allotments. Section 2 was added as a response to concerns that Native Alaskans would abuse this right by obtaining allotments in national forests for the sole purpose of selling them. See Shields, 698 F.2d at 989. At the same time, the "vacant, unappropriated, and unreserved" requirement was added to section 1. Assistant Secretary of the Interior Wesley A. D'Ewart, who proposed the amendment, explained it as follows:
 
 
 8
 Subsection (b) of the enclosed substitute bill makes it clear that homesteads may be selected under section 1 of the 1906 act only from vacant, unappropriated, and unreserved land. That has been the consistent administrative interpretation of the act. Unless that fact is specified, however, the provision in section 2 of the bill permitting Indian homesteads to be selected in national forests under certain circumstances might be made the basis for an inference that other reserved lands are also available for homesteading.
 
 
 9
 S.Rep. No. 2696, 84th Cong., 2d Sess., reprinted in 1956 U.S.Code Cong. & Ad.News 4204. We conclude that the plaintiffs' construction of the statute is incorrect.
 
 
 10
 The plaintiffs also argue that the right to seek allotments was inheritable. While we have held that use and occupancy rights are transferable, e.g., Arness v. Petersburg Packing Co., 260 Fed. 710, 712 (9th Cir.1919), we know of no authority for the proposition that the right to seek an allotment is transferable. In light of the legislative history discussed above, we reject that proposition.
 
 B. The Validity of the Withdrawals
 
 11
 All of the wildlife refuges at issue in this case were created by Executive Orders. The plaintiffs contend that the Executive lacked authority to disturb their right to seek allotments by creating wildlife refuges. We disagree. The Pickett Act, ch. 421, 36 Stat. 847 (1910) (repealed 1976), authorized the President to reserve public lands for public purposes. The lands in question were "public lands" within the meaning of the Pickett Act. See Larkin v. Paugh, 276 U.S. 431, 438, 48 S.Ct. 366, 368, 72 L.Ed. 640 (1928). While the plaintiffs argue that the "settlement" exception to the Pickett Act applies in this case, that exception requires the "settler" to maintain and perfect the settlement pursuant to law. Ch. 421, Sec. 2, 36 Stat. 848 (1910). Because the plaintiffs did not "perfect" their claim by seeking an allotment, we find that the settlement exception is inapplicable. But even if the Pickett Act did not authorize the creation of these wildlife refuges, we would uphold the withdrawals because Congress ratified the Executive Orders in section 305 of ANILCA, Pub.L. No. 96-487, Sec. 305, 94 Stat. 2395 (1980).[2]C. The Effect of the Withdrawals
 
 
 12
 The plaintiffs contend that the lands in question remained unreserved and unavailable for allotment notwithstanding their withdrawal for use as wildlife refuges. Initially, they argue that Congress acted to segregate lands used and occupied by Alaska Natives from the public domain until such time as they could secure title. In support of this argument, the plaintiffs cite a long string of statutes and treaties, beginning with Article III of the Treaty of Cession, 15 Stat. 539 (1867), and ending with section 4 of the Alaska Statehood Act, Pub.L. No. 85-508, Sec. 4, 72 Stat. 339 (1958) (amended 1959). The rights granted by these statutes and treaties, however, have never been held to rise to the level of enforceable ownership rights. See Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 338-39, 65 S.Ct. 690, 692-93, 89 L.Ed. 985 (1945); Beecher v. Wetherby, 95 U.S. (5 Otto) 517, 525, 24 L.Ed. 440 (1877). See generally P. Maxfield, M. Dieterich & F. Trelease, Natural Resources Law on American Indian Lands, Secs. 4-3 to -6 (1977). In Tee-Hit-Ton Indians, a group of Alaska Natives attempted to assert a compensable property right in the lands they occupied. The Supreme Court rejected their claim:
 
 
 13
 We have carefully examined these statutes and the pertinent legislative history and find nothing to indicate any intention by Congress to grant to the Indians any permanent rights in the lands of Alaska occupied by them by permission of Congress. Rather, it clearly appears that what was intended was merely to retain the status quo until further congressional or judicial action was taken.
 
 
 14
 348 U.S. at 278, 75 S.Ct. at 317. Congressional action has now been taken, eliminating the right of Alaska Natives to seek allotments.
 
 
 15
 The plaintiffs also contend that the withdrawals provide an express exception for their claims. Each withdrawal was made "subject to valid existing rights." These exceptions, however, only apply to use and occupancy rights. Prior to receiving an allotment, an Alaska Native has no title to any of the lands subject to the Allotment Act. Cf. Nadeau v. Union Pacific R.R. Co., 253 U.S. 442, 445-46, 40 S.Ct. 570, 571, 64 L.Ed. 1002 (1920) (interpreting the General Allotment Act, which applies to all Native Americans outside of Alaska). Moreover, none of the plaintiffs had "valid existing rights" in the land at the time that the wildlife refuges were withdrawn. As a result, the withdrawals eliminated their right to seek allotments.
 
 
 16
 D. The Clarence Rhode National Wildlife Range
 
 
 17
 Public Land Order 2213, which created the Clarence Rhode National Wildlife Range,[3] provided:
 
 
 18
 This order shall not be construed to abrogate or impair any legal or aboriginal claim of right of the natives to use the lands, if any, and they may hunt, fish, and trap in accordance with applicable law, and carry on any other lawful activities.
 
 
 19
 This statement was added to the formal withdrawal order in response to concerns raised during public comment on the original proposal.
 
 
 20
 The plaintiffs claim that the language of the order preserved their right to apply for an allotment within that wildlife refuge. First, they contend that the literal wording of the order preserved their "legal right" to apply for an allotment. We disagree. The rights preserved by the order were expressly limited to use, rather than ownership. Even though statutes and administrative orders concerning Native Americans are to be given a liberal construction, see Pence v. Kleppe, 529 F.2d 135, 140 (9th Cir.1976), we find that the literal language of the order did not embrace the right to apply for an allotment.
 
 
 21
 Second, the plaintiffs argue that the administrative history of the order shows that it was intended to preserve their right to apply for allotments. A representative of the Department of the Interior told a group of Alaska Natives that it was his understanding that after-arising allotment rights would not be disturbed. He conditioned his remarks, however, by noting:
 
 
 22
 We merely stress these points which are a matter of good faith and which the Secretary who is the man who makes the decision (we are just merely gathering the testimony) will take these into consideration. We do not know what he will do with them. He may throw this whole thing out; he may accept it as it is; or he may modify it based on points raised by you men here tonight.
 
 
 23
 While it is true that he submitted a report to the Bureau of Land Management recommending protection of after-arising allotment rights, it appears that his recommendation was ignored. In any event, we must defer to the Department's interpretation of its administrative orders if that interpretation is "not unreasonable [and] the language of the orders bears [that] construction." Udall v. Tallman, 380 U.S. 1, 18, 85 S.Ct. 792, 802, 13 L.Ed.2d 616 (1965). We cannot say that the Department's interpretation is unreasonable.
 
 III
 CONCLUSION
 
 24
 Since 1867, Congress has permitted the use and occupancy of unappropriated real property by Alaska Natives. In the case of the plaintiffs before us, their hope and expectation of attaining title to the lands that they and their ancestors have occupied for generations has been thwarted by administrative withdrawals. The fairness of this administrative action, which has deprived the plaintiffs of any chance to obtain title, should be reviewed by Congress.
 
 
 25
 The judgment of the district court is AFFIRMED.
 
 FERGUSON, Circuit Judge, concurring:
 
 26
 Under existing law I must concur in the result but I write separately for two reasons. First, because the Alaska Natives are victims of unfortunate technical traps which deprive them of the relief they seek; and second, because I respectfully suggest that Congress should grant the plaintiffs the right to obtain allotments. I therefore set forth in greater detail than the opinion of the Court factual matters which support my suggestion.
 
 
 27
 This case began when four Alaska Natives filed applications under the Alaska Native Allotment Act (Allotment Act) for allotments of land within the exterior boundaries of three national wildlife refuges in Alaska. Under the provisions of the Allotment Act land was available for allotment only if it was "vacant, unappropriated, and unreserved." 43 U.S.C. Sec. 270-1 (repealed 1971). In each case, the Department of the Interior determined that an executive withdrawal prior to the initiation of the applicant's personal use and occupancy of the land deprived the land of its status as vacant, unappropriated and unreserved. Thus, the Department concluded that the land was not available for allotment and denied the applications.
 
 
 28
 The use of the contested lands by the applicants conforms to a specific pattern. In each instance, use of the land was initiated by an ancestor or other Native predecessor of the applicant. That use was intensive and specific to the land now sought. After the death of the original occupant, the use was continued, without interruption, by that occupant's descendants until the time that the applicant began his or her own independent use. At a time subsequent to the initiation of occupancy by the original occupant, but prior to the beginning of the applicant's independent use, the Department of the Interior, by executive action, withdrew areas of land which include within their exterior boundaries the lands now sought by the applicants. This land has been designated by Congress as the Yukon Delta National Wildlife Refuge (Yukon Delta Refuge), the Arctic National Wildlife Refuge, and the Kodiak National Wildlife Refuge. Pub.L. No. 96-487, Sec. 303(2), (5), (7), 94 Stat. 2390-93 (1980).
 
 
 29
 An example of the use of the land by an applicant is as follows:
 
 
 30
 Peter Panruk was born in Old Chefornak on June 10, 1949, and began going to his claimed allotment at a young age, in the company of his family. Parcel A of his Native Allotment is located on the north bank of the Kinia River, about six miles west of Chefornak, and consists of 80 acres in what is now the Yukon Delta Refuge. At the age of three or four, he began to hunt for small game, ringtail or ptarmigan, with a bow and arrow. He would also collect eggs. When he was seven, he joined the older men in hunting seal with a rifle. He began to hunt seal by himself in 1959, at the age of ten. Later in the season, he and his family would catch whitefish and flounder and gather berries and wood on the land.
 
 
 31
 Parcel B, also within the Yukon Delta Refuge, consists of 80 acres located three or four miles from Chefornak and close to the Kinia River. Mr. Panruk and his family did not camp there but went there frequently. He began going by himself to this land in 1959, at age ten. In the summer he picked berries; in the fall he fished and hunted geese and ducks. Mr. Panruk continues to use both parcels each year for subsistence purposes. His family depends upon the food which they gather there.
 
 
 32
 Each parcel claimed by Mr. Panruk had been used by his parents and grandparents in the customary seasonal manner of Yupik Eskimos since at least 1910. His grandfather is buried on the land called Parcel A. These uses continued unabated from the early 1900's until the time the plaintiff began his independent, potentially exclusive use of the various parcels.
 
 
 33
 In May of 1948, the United States Fish and Wildlife Service began to express interest in establishing a large wildlife preserve on the Yukon-Kuskokwim Delta, primarily to provide protection for the large numbers of migratory waterfowl which nest in the area. A formal request was filed in the Fairbanks Land Office on January 29, 1955. That application included, within its exterior boundaries, the land being occupied by Peter Panruk's parents and, in fact, being used by a very young Peter Panruk for hunting small game and collecting eggs. Finally, on June 16, 1955, a "Notice of Proposed Withdrawal and Reservation of Lands" was published in the Federal Register. 20 Fed.Reg. 4227-28 (1955).
 
 
 34
 After publication of the initial notice of proposed withdrawal, two major objections were voiced. First, oil and mining interests protested the proposed closure, under mining and mineral-leasing laws, of an area which they saw as a potential development field meriting considerable exploratory work. Second, the Alaska Natives objected to the withdrawal unless the Natives were explicitly granted the right to continue their customary hunting, fishing, and trapping in the areas to be withdrawn.
 
 
 35
 Responding to the large number of objections raised after it published the Notice of Proposed Withdrawal, the Department of the Interior exercised its discretion to hold a public hearing on the proposed refuge. The meeting was held in Bethel, Alaska on March 1, 1956 and was presided over by Roger R. Robinson, Alaska Operations Supervisor of the Bureau of Land Management.
 
 
 36
 At the hearing, the Fish and Wildlife Service representative commented:
 
 
 37
 [The withdrawal] is not intended to stop people from doing anything here. It is the intent to guarantee that the natural nesting grounds here will always be here ... it is not to interfere with hunting and fishing and stuff [that] goes on now ....
 
 
 38
 R. Robinson, Hearings Officer, Hearings Officer Report on Public Hearing March 1, 1956 at Bethel, Alaska Covering Proposed Establishment Kuskokwim National Wildlife Management Area 3 (April 16, 1956). Thus, the government responded to fears of the impairment of the subsistence activities by promising that these would not be affected by creation of a refuge.
 
 
 39
 In addition to assurances of protection for subsistence usage of the land, the government specifically informed the Natives that legal claims of right under the Allotment Act would be protected. In fact, the specific issue raised in this lawsuit was addressed at the hearing in Bethel as follows:
 
 
 40
 MR. SCHMIDT: The point I wanted to raise is this, if in the future, at any time--10 or 15 years from now it should become economically important for any of these people to get ownership to a certain amount of land, what chance would they have to get the land surrounding their villages under this act?
 
 
 41
 MR. ROBINSON: They have valid existing rights.
 
 
 42
 MR. SCHMIDT: Then their right would be protected?
 
 
 43
 MR. ROBINSON: Yes.
 
 
 44
 MR. NUCKOLES: Could they take up 160 acres out there in the middle of this refuge?
 
 
 45
 MR. ROBINSON: You mean their allotments?
 
 
 46
 MR. NUCKOLES: Well, they could file as an Indian, or an Eskimo, or an Aleut here native born. They could file on 160 acres anywhere they wanted to?
 
 
 47
 MR. ROBINSON: That is the right they have now prior to the withdrawal, so therefore they can exercise it if they wish.
 
 
 48
 MR. NUCKOLES: Even after the withdrawal?
 
 
 49
 MR. ROBINSON: They can exercise it any time they want to--that is what we mean by valid existing rights. You see, the Government does not make this retroactive.
 
 
 50
 QUESTION: Can they withdraw that on ground they are not actually living on. I mean just go out and take any part of it and file on it after the withdrawal or do they have to just have what they are squatting on right now after the withdrawal?
 
 
 51
 MR. ROBINSON: That's a point which we will stress in the hearing here. It is my understanding that the Fish and Wildlife Service does not intend to interfere in any way if the natives there would want to move from this point to that point to this point within the Refuge or outside, or back into it. In other words, the present mode of living would be assured. Now, it's true that in point of law at the time the withdrawal order went into effect the place that they are now living would be their valid existing right, however, I have been told by the Fish and Wildlife Service that is not their intent, that if the individual chooses at some later time to take a site over here, that they can do so. Now we will make that point underlined in the record for review of the Secretary.
 
 
 52
 MR. GUILSHER: You have mentioned the intent of the Fish and Wildlife Service. What guarantee do we have that the final bill will include all these concessions and promises?
 
 
 53
 MR. ROBINSON: We merely stress these points which are a matter of good faith and which the Secretary who is the man who makes the decision (we are just merely gathering the testimony) will take these into consideration. We do not know what he will do with them. He may throw this whole thing out; he may accept it as it is; or he may modify it based on points raised by you men here tonight.
 
 
 54
 Public Hearing of the Kuskokwim Withdrawal Area, March 1, 1956 at Bethel, Alaska 38-9 (R. Robinson, presiding officer, testimony of witnesses A. Schmidt and G. Guilsher) (emphasis in original).
 
 
 55
 The report Mr. Robinson submitted to the Bureau of Land Management following the hearing emphatically recommended that the withdrawal be made only if after-arising allotment rights were protected. Mr. Robinson reported that "the matter of native occupancy rights in the proposed withdrawal ... [is] a most important facet [of response to the proposal]." R. Robinson, Hearings Officer, Hearings Officer Report on Public Hearing March 1, 1956 at Bethel, Alaska Covering Proposed Establishment Kuskokwim National Wildlife Management Area 7 (April 16, 1956). He voiced particular concern regarding protection of after-arising allotments:
 
 
 56
 The Eskimos in the general region tend toward a semi-nomadic life. They move about from place to place as they pursue their year-round search for food or income .... Now, then, assume a withdrawal from all forms of appropriation is made. It is assumed that "valid existing rights" is implied or will be incorporated in the order. Assume that such a withdrawal was made March 1, 1956.
 
 
 57
 Now, at some later date one of the Eskimos living in the area wants to acquire title to a piece of land. If he occupied prior to March 1, he could get it; if not, he couldn't .... It would seem some definite saving clauses must be included in any order of withdrawal.
 
 
 58
 Id. at 7-8.
 
 
 59
 Mr. Robinson was requesting language in the final order that would supplement protection given to existing allotments by the "valid existing rights" clause. He recommended that the refuge be created only if this suggestion was followed:
 
 
 60
 I can recommend withdrawal only if terms of public land order definitely ... provide for definite avoidance of technical traps in cases where Eskimos may seek patent or allotment of land bona fidely occupied subsequent to PLO date as a result of their semi-nomadic life and, of course, new families.
 
 
 61
 Id. at 10.
 
 
 62
 It is evident that Alaska Natives are victims of the technical traps of which Mr. Robinson warned. They were caught in these traps solely because they lived, as did their ancestors, a semi-nomadic life necessitated by their search for food. The plaintiffs should not be punished for their traditional life style. Congress should enact law consistent with the good faith expressed by Mr. Robinson, the government representative in the field.
 
 
 63
 CHAMBERS, Circuit Judge, concurs in the opinions of Judges FERGUSON and BEEZER.
 
 
 
 *
 William Clark has been substituted for James Watt pursuant to Fed.R.App.P. 43(c)(1)
 
 
 [1]
 The district court certified a class of plaintiffs consisting of:
 All Alaska Natives who made timely application for allotments under the Alaska Native Allotment Act ... for lands located within the boundaries of those National Wildlife Refuges, now known as the Arctic National Wildlife Refuge, the Yukon Delta National Wildlife Refuge and the Kodiak National Wildlife Refuse [sic] and whose applications have been or will be denied because the land they sought was considered reserved or otherwise unavailable for allotment for reasons related to or arising out of its status as withdrawn land.
 
 
 [2]
 The plaintiffs also argue that the Executive lacks authority to extinguish rights created by Congress. Even if Congress had vestedthe right to seek allotments in the Alaska Natives, this is not a case in which the President has acted without regard to the will of Congress. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). See generally Quint, The Separation of Powers Under Carter, 62 Texas L.Rev. 785, 788-826 (1984) (discussing conflicts in the allocation of policymaking power between the executive and legislative branches in the absence of an express constitutional provision). Instead, we find that the Executive's actions were expressly authorized by the Pickett Act and ratified by ANILCA
 
 
 [3]
 The Clarence Rhode National Wildlife Range was incorporated into the Yukon Delta National Wildlife Range by section 303(7) of ANILCA