Mr. Justice Huger
delivered the opinion of the court:
If the land granted to the plaintiff was not vacant in 1785, (the date of his grant,) he is not entitled to his motion, for by the act of 1784, only vacant land was directed to be granted, and if the land was vacant, and the legislature of 1786 had the power to make void his grant, he must also fail; for by the act of 1786, his grant is declared null and void, I shall therefore enquire,
1st. Whether the land in question was vacant in 1785.
2d. Whether the Legislature of 1786 had the power to declare and make void the plaintiff’s grant of 1785.
It appears from the first article of the treaty of 1777, with the Cherokee nation, that the district of country in which the plaintiff’s grant was located, was ceded to the State of South-Carolina. By? the 2d article, South-Caroliengages to permit, the Cherokees to inhabit the said *357 district of country during good behaviour. Here are mutual engagements solemnly entered into ■ between the contracting parties, and binding upon both, at least as binding as any contract can be upon sovereign powers.
But it is contended that although the Cherokces were permitted to inhabit this land during good behaviour, it was a tenancy at will, which the state at pleasure might defeat, and did defeat by the grant to the plaintiff under the act of 1784.
Without adverting to the inapplicability of the terms tenant and landlord, and the rules by which they are governed, to sovereign powers it is only necessary to observe, that no two estates can be more distinct than a tenancy at will, and an estate held during good behaviour, which at common law is an estate for life ; as the law cannot presume the extinction of a nation, an estate granted to one during good behaviour, must be an estate for ever. As long then as the Cherokces conformed to the conditions of the treaty, that is, “ behaved themselves well,” this State was morally bound to permit them to continue in undisturbed possession of the land in question. Had this state, however, with or without sufficient cause, declared the condition to be broken, on which they were permitted to hold the land, and that the same had become Vacant, and should be granted out to individuals, the municipal courts must have been governed by such declaration, and the grant to the plaintiff must have been regarded as valid. But no such declaration has ever be.en made by this state ; she has, on the contrary, by all her acts, evinced the most perfect satisfaction with the conduct of that nation. From 1777 to 1816, their laws alone were of force in this reserved territory; and when in 1816, this-State wished to acquire full and complete sovereignty over this territory, she, under the auspices of the general government entered into a negotiation with the Indians for the relinquishments of those rights which were acknowl^ edged to be in them, and for which, by treaty, she ery gaged to give, and did give an equivalent in money.-— *358 At no period bas this state regarded it as consistent witír her faith and character, to deprive these unoffending aborigines of the remnant of right secured to them by the-treaty of 1777, unless indeed, she did so by the act of 1784, as is not contended by the plaintiff. So much at variance would it have been with the character she has always preserved, and which I trust she ever will preserve, that I should feel unauthorized to conclude she had done-so, but on -the strongest evidence. It is not sufficient to authorize such a-conclusion, that an act of the legislature might be so construed; nothing less than the most plain and unequivocal language could force me to such a conclusion. What, however, is the language of the act of 1784 ? It is entitled, “ an act for establishing the mode and conditions of surveying and granting the vacant lands within this state its dbject is general, it refers to every part of the state, and only vacant land is to be surveyed and granted. ■ Land appropriated by the legislature is not vacant, be that appropriation what it may ; to individuals, to public' purposes, or to the Cherokees. In one of the enacting clauses, it is declared “ that all the lands lying and being to the northwest of the ancient boundary line, between the Cherokee Nation of Indians and this State, running from Savannah river, 50 degress east to Reedy river, and then due north, until it intersects the No. Carolina line, shall be granted and sold, ” &c. This clause when read in connexion with the preamble and qualified by it, obviously means that all the vacant land above the old Indian boundary line, shall be surveyed and granted. Had the reserve consisted of all the land beyond this line, the intention of the legislature would have been manifest, but as the vacant land above the line, not reserved, consisted of the districts of Pendleton and Greenville, as they stood '-before 4he treaty of 1816, making nearly one eighth of the 'state,'andThe reserve of not more than a fiftieth part of that quantify, ií is unnecessary to give meaning to the clause .tb'in'dfqcl.^the reserve within its provisions. Toinclude the reserve, wqjuld be to attribute to the legislature of 1784, a *359 deliberate intention of violating the faith of the state, without a possible motive; for at that time they could not have anticipated the advance of our population to it in much less than a century; for it is only now that our population, which has increased in an unprecedented ratio, is approximating to it. But such was not the intention of the legislature. Only so much .of the territory ceded by the Indians Was vacant, as was not reserved to them by the treaty of 1777, and for only so much, were the executive officers of the state authorized to issue grants by the act of 1784.
That such was the intention of the legislature, appears not only from a fair construction of the act of 1784, but from their subsequent act passed in 1786, which is substantially declaratory of that act. The act of 1786, not only confirms to the Cherokees the reserve secured to them bj the treaty of 1777, but declares null and void all grants-which may have -been procured for any part thereof Whether the officers of the state issued the grant by mistake or were deceived by the grantee, is not material in cither case. 5 it was void, having been issued without authority, the land not being vacant within the meaning of the act of 1784.
Had, however, the act of 1784, authorized' the issuing of this grant, the legislature of 1786 declared it null and Void. This brings me to the consideration of the second question.
Between the declaration of our National Independence and the adoption of the Federal Constitution, this state was sovereign and uncontrolled. The people, in whom all power was vested, thought proper .to employ the legislature as their agents,, in the exercise of that power. In the use of this power, the legislature was unlimited. The were the representatives of the people ; for all whatever could be done by the people,- could 1 the legislature. Each succeeding legislature po: same power, and could not be bound by any acceding legislature, for each legislature was tl Whatever, therefore, one legislature could en *360 ceeding legislature could repeal. The form of government adopted by the legislature of 1776, was no more than any other legislative act, and was subject to the revi-' sion.and repeal of a succeeding legislature. The legislature of 1778, did revise and repeal the act of 1776, and adopted another form of government, which is called the constitution of 1778. This constitution pretends to no control over succeeding legislatures, although it does restiaift the officers of government in the exercise of the powers vested in them for the administration of the laws. Had it attempted to restrain future legislatures, it would have been inoperative; as each legislature possessed all the power of the people, who can undo whatever the’y may have done.
The people, or their representatives, the legislature, when unlimited by the people, may do whatever is phjsica.U}r possible, although they ought not as moral agents to do what is morally wrong. Should they, however, do what is morally wrong, being supreme, they could not be restrained. "Were the judicial tribunals, (which are Iimite'5 in their power, and only appointed to administer the laws enacted by the people,) to declare an act void because immoral, the power of the people would be usurped, and the judicial power would become so far supreme. However painful it might be to those who preside in these tribunals to enforce laws repugnant to the moral sense, they must conform as long as they continue Judges, to the duties of their station. An unlimited legislature is despotic in its power, and it was to prevent the probable abuse of such power, that the people of this country adopted their constitution; in which the legislature as -well as every other agy-nt of the people, are required to confine themselves within certain specified boundaries. Whenever they travel beyond their prescribed limits, it is made the duty of the judges to restrain them ; for the constitution is the permanent law. In 1786, however, we had no-such constitution, and the Legislature was at liberty to repeal the act of 1784, and to declare as null and void, eve *361 éy act done in conformity to it. If such declaration defeated a Contract which the state had fairly made with the plaintiff, it was morally wrong ; but this court has not the power to annul it. But was it wrong in the State to annul a contract with the plaintiff, which was itself a violation of a preceding contract wjth the Cherokécs ? A s<¡uredly not. Where consecutive wrongs' are to be expiated, it is usually right, and not morally wrong. To begin with the first, I must therefore conclude that the grant to the plaintiff was issued through mistake, and that the Le~ gisláture of ’86 had the power to annul, and did annul the" grant in question. It has been said, however, at the bar, that the proceeding in such a case should be by scire facias,. That it is so in England, may be admitted. The parliament of that country Consisting of King, Lords and Commons, has the power to prescribe the inode in which such a proceeding should be conducted in England, and by which tribunal it should be decided. Had it however been their pleasure, they might have retained it themselves, as did the Legislature of this State in 1786. It was certainly not incumbent upon the people ofithis State to adopt the mode which had been thought best in England. The Legislature of ’85 had jurisdiction of the case, if they thought proper to sustain it. They did sustain it, and their decision is as conclusive in this court as would have been the decision of any other' court having competent jurisdiction. On both grounds, I am with the defendant.
Earle ¿y Harrison, for the motion,
Davis, contra.
The motion of the plaintiff must therefore fail, and judgment be awarded to the defendant.
Justices Gantt, Jfott and Johnson, concurred,