**CATAWBA INDIAN TRIBE OF SOUTH CAROLINA, also known as the Catawba Nation of South Carolina, Appellant,**

v.

**STATE OF SOUTH CAROLINA, et al., Appellees.**

**No. 82–1671.**

United States Court of Appeals, Fourth Circuit.

Argued April 6, 1988.

Decided Jan. 23, 1989.

Jerry Jay Bender (H. Clayton Walker, Jr., Jean H. Toal, Belser, Baker, Barwick, Ravenel, Toal & Bender, Columbia, S.C., Don B. Miller, Native American Rights Fund, Boulder, Colo., Robert M. Jones, Richard Steele, on brief), for appellant.

J.D. Todd, Jr. (Michael J. Giese, Gwendolyn Embler, Leatherwood, Walker, Todd & Mann, Greenville, S.C., John C. Christie, Jr., J. William Hayton, Patrick J. Roach, Janet F. Satterwhite, Brian A. Runkel, Bell, Boyd & Lloyd, Washington, D.C., Dan M. Byrd, Jr., Mitchell K. Byrd, Byrd & Byrd, Rockhill, S.C., T. Travis Medlock, Atty. Gen., Kenneth P. Woodington, Asst. Atty. Gen., James D. St. Clair, P.C., James L. Quarles, III, William F. Lee, Daniel Solomon, Hale & Dorr, Boston, Mass., on brief), for appellees.

Before WIDENER, HALL, PHILLIPS, MURNAGHAN and SPROUSE, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

The Supreme Court remanded this case for us to determine whether the claim of the Catawba Indian Tribe to a tract of land is barred by South Carolina statutes of limitations. *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986). We hold that the statutes of limitations pertaining to disabled persons, sections 15–3–370 and 15–3–40 of the Code of South Carolina, do not bar the tribe from maintaining this action. We also hold that sections 15–3–340 and 15–67–210 bar the tribe from recovering possession and damages from a person who holds and possesses property that has been held and possessed adversely to the tribe's legal title for ten years after the revocation of the tribe's constitution, July 1, 1962, and before the commencement of this action, October 20, 1980, without tacking except by inheritance. We also hold that the statutes of limitations do not bar the tribe from recovering possession and damages from other persons. We therefore affirm in part and reverse in part the district court's grant of summary judgment in favor of the state and all persons in possession and remand the case for further proceedings on the issues remaining to be tried.

I

The facts that we assume for the purpose of summary judgment are recounted in the majority and dissenting opinions of the Supreme Court [1] and need only be summarized here. In the 1760 Treaty of Pine Hill and the 1763 Treaty of Augusta, the tribe agreed with representatives of the King of England to relinquish its aboriginal territory in exchange for permanent resettlement on a fifteen square mile tract in South Carolina. In the 1840 Treaty of Nation Ford, the tribe transferred its interest in the tract to South Carolina. The United States did not participate in the Treaty of Nation Ford.

In 1959, Congress passed the Catawba Act, 73 Stat. 592, 25 U.S.C. §§ 931–38 (1976), which ultimately led to the revocation of the tribe's constitution on July 1, 1962. As of that date, the tribe's claim to the land it relinquished in 1840 became subject to South Carolina statutes of limitations.

In 1980, the tribe brought suit to recover possession of its land and damages. It asserts that the 1840 Treaty of Nation Ford was void because the United States did not participate in it or consent to the alienation of the tribe's reservation as required by the Indian Nonintercourse Act.[2]

---

1. *See South Carolina v. Catawba Indian Tribe*, 476 U.S. at 500–05 and 511–18, 106 S.Ct. at 2041–43 and 2046–50 (Blackmun, J., dissenting).

2. 25 U.S.C. § 177 (1976) (originally enacted as Act of July 22, 1790, ch. 33, § 4, 1 Stat. 138). The Act states in relevant part:
   No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto,

## II

The state argues that the tribe was a disabled plaintiff within the meaning of sections 15–3–370 and 15–3–40 from 1840 to 1962, when Congress passed the Catawba Act. Therefore, the state asserts, the tribe had no longer than ten years after 1962, when its disability was lifted, to bring suit. According to the state, since the tribe did not file suit within this period, the statute of limitations bars its claim.[3]

Section 15–3–370 on which the state primarily relies provides:

Persons under disability.

If a person entitled to commence any action for the recovery of real property, or make an entry or defense founded on the title to real property or to rents or services out of the same be, at the time such title shall first descend or accrue, either:

(1) Within the age of eighteen years;

(2) Insane; or

(3) Imprisoned on a criminal or civil charge or in execution upon conviction of a criminal offense for a term less than life;

The time during which such disability shall continue shall not be deemed any portion of the time in this article limited for the commencement of such action or the making of such entry or defense, but such action may be commenced or entry or defense made after the period of ten years and within ten years after the disability shall cease or after the death of the person entitled who shall die under such disability. But such action shall not be commenced or entry or defense made after that period.

Section 15–3–40 recognizes identical disabilities for other causes of action.

■ The state's position cannot be reconciled with section 15–3–370. The statute applies to only three classes of plaintiffs: infants, the insane, and persons imprisoned for less than their natural lives. Nothing in the statute creates a fourth class of plaintiffs in the tribe's position. Application of the statute obliges us to ascertain the legislature's intent. We cannot read something into the statute that the legislature did not contemplate. Quoting its precedents, the South Carolina Supreme Court has emphasized:

[C]ourts have no legislative powers, and in the interpretation and construction of statutes their sole function is to determine, and within the constitutional limits of the legislative power to give effect to, the intention of the Legislature. They cannot read into a statute something that is not within the manifest intention of the Legislature as gathered from the statute itself. To depart from the meaning expressed by the words is to alter the statute, to legislate and not to interpret. The responsibility for the justice or wisdom of legislation rests with the Legislature, and it is the province of the courts to construe, not to make, the laws.

*Belk v. Nationwide Mutual Insurance Company*, 271 S.C. 24, 27, 244 S.E.2d 744, 746 (1978). We conclude that the Supreme Court of South Carolina would not construe sections 15–3–370 and 15–3–40 to include Indians in the legislatively defined class of disabled persons. Therefore we hold that the disability statutes do not bar the tribe's claim.

## III

Section 15–3–340 provides that no action for the recovery of possession of real property shall be brought unless the plaintiff or his predecessor was seized or possessed of the premises within 10 years before the commencement of the action. Section 15–67–210 creates a presumption of possession if the plaintiff establishes legal title.[4] The tribe acknowledges that it has not been in possession of the tract since 1840, but it maintains that it has Indian title to the tract and that Indian title is legal title

___

from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

**3.** For convenience we refer to all defendants collectively as the state.

**4.** Sections 15–3–340 and 15–67–210 are quoted in part V of this opinion.

within the meaning of section 15–67–210. Therefore, the tribe claims that it is entitled to the presumption of possession prescribed in section 15–67–210 and that the state cannot defeat its claim on the basis of the statute of limitations. The state argues that the tribe is not entitled to the presumption because Indian title is not legal title and that the presumption is inapplicable because the tribe admits it has been out of possession since 1840.

■■■ Indian title is a creation of federal law. It is the title given to land occupied by Indians when the United States gained its independence from Great Britain and became the sovereign. Indian title includes a right to possession superior to that incident to fee simple title; where Indian title and fee simple title coexist, the fee simple interest operates merely as a reversionary right to possession which can take effect only when Congress extinguishes the Indian title. Indian title includes the right to exclude all others, including holders of fee simple title, through state law possessory actions such as ejectment and trespass. Indian title cannot be alienated except by Act of Congress; a purported conveyance of the possessory right, even if made by a tribe having such title, is void and no title passes. Except where Congress provides otherwise, claims based on Indian title are not subject to state law defenses such as statutes of limitations, adverse possession, or laches. *See generally Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666–74, 94 S.Ct. 772, 776–81, 39 L.Ed.2d 73 (1974); F. Cohen, *Handbook of Federal Indian Law*, 471–574 (1982 ed.).

The state correctly points out that the 1763 Treaty of Augusta, which is the source of the tribe's Indian title, is not recorded in the Registry of Mesne Conveyances. Relying on this fact, it argues that the tribe's Indian title is not legal title. It insists that legal title is record title; that is, the title that is reflected in the Registry of Mesne Conveyances, and it cites numerous cases from South Carolina and other jurisdictions that refer to legal title and record title synonymously.[5]

■■■ Neither South Carolina nor federal law supports the state's argument. The tribe's source of title is recorded, though not in the Registry of Mesne Conveyances. The Treaty of Augusta recites that the Catawbas accepted "the Tract of Land of Fifteen Miles square, a Survey of which by our consent and at our request has been already begun." XI Colonial Records of North Carolina 201–02 (1763). Current South Carolina law affirms that the survey was filed in the office of the Secretary of State. Section 27–15–30 describes the Catawba Indian lands as "situated in the counties of York and Lancaster, within a boundary of fifteen miles square and which are represented in the plat of survey made by Samuel Wiley, dated February 22, 1764 and now on file in the office of the Secretary of State." The state legislature recognized the survey filed in the office of the Secretary of State as a muniment of title, and it is reasonable to assume that the Supreme Court of South Carolina would take similar notice of it.

Our conclusion that lack of recordation in the Registry of Mesne Conveyances does not defeat the tribe's claim is substantiated by sound judicial precedent. The Superior Court of Law sustained a reservation for German immigrants in *Hawkins' Devisees v. Arthur*, 2 S.C.L. (2 Bay) 195 (1798). In 1730, the King of England offered "bounties of land" to his subjects residing in Germany. Notwithstanding the lack of a recorded deed, the court held that a reservation granted by the crown was superior to a subsequent grant from the state. The plat of a survey entered in the council books was a sufficient muniment of title. 2 S.C.L. (2 Bay) at 202–03. Even though the crown and subsequently the state held the reservation in trust for those persons who had a right of occupancy, the court ruled:

As to the legal effect of this reservation, there could be no question about it. It amounted to a covenant in law, between

---

5.  *See, e.g., Parr v. Parr*, 268 S.C. 58, 231 S.E.2d 695 (1977); *Lynch v. Lynch*, 236 S.C. 612, 115 S.E.2d 301 (1960); *Knight v. Hilton*, 224 S.C. 452, 456, 79 S.E.2d 871, 873 (1954).

the crown and the people, for whose use and benefit it was intended; that the land contained within the boundaries of that plat, should for ever thereafter be appropriated and disposed of, for the use and benefit of the inhabitants of the said town and township and their heirs for ever, and to and for no other intent and purpose whatsoever.

2 S.C.L. (2 Bay) at 203.

In *Thomas v. Daniel*, 13 S.C.L. (2 McCord) 354, 357 (1823), the Constitutional Court of South Carolina stated that a 1777 treaty between the Cherokees and the state which by "mutual engagements" granted the Indians the right to inhabit certain lands during good behavior "was at least as binding as any contract can be upon sovereign powers." The court held that an estate granted a nation during good behavior "must be an estate forever" and that as long as the Cherokees conformed to the treaty, that is " 'behaved themselves well,' this State was morally bound to permit them to continue in undisturbed possession of the land in question." 13 S.C.L. (2 McCord) at 357. The court then held that a subsequent grant by the state of a part of the reservation to a person who challenged the Cherokee grant was void. The lack of recordation in the Registry of Mesne Conveyances was no impediment to the Cherokees' title. Although the Constitutional Court did not use the term Indian title, the Indians' "estate forever" had incidents of Indian and legal title.

Current South Carolina law is consistent with the precedent established by *Thomas* and *Hawkins' Devisees.* Recordation in the Registry of Mesne Conveyances, while often a convenient proof of a conveyance, is not essential to establish legal title. In *Haithcock v. Haithcock,* 123 S.C. 61, 68, 115 S.E. 727, 729 (1923), the Supreme Court of South Carolina approved an instruction that explained to a jury how a claim of title can be established:

Now, those are the ways in which a man may show title to land: First, by tracing it to the state, under a grant from the state; second, by tracing his title from a common source; third, by

showing possession for 20 years in himself and those under whom he claims; and, fourth, by showing 10 years' possession in himself, or by inheritance.

The tribe rests its title on the first way—a grant of a reservation from the crown recognized by the state. Indeed, this grant is the common source of title, because the lessees of land encompassed by the grant and their successors, present occupants, trace title to the same crown reservation through grants made pursuant to the subsequent Treaty of Nation Ford. *See* S.C. Code Ann. §§ 27–15–30, –40, and –50.

*Haithcock* is also singularly instructive because it applies the statutory presumption on which the tribe relies without requiring proof of recordation or registry. After repeating four ways in which a person can prove title, the trial court correctly charged the jury: "Now, if he has shown that kind of title, then the possession is presumed to have been in the man who shows title in either one of these four ways." 123 S.C. at 85, 115 S.E. at 734. This presumption of possession is precisely what the tribe claims, having traced its title in the first of the four ways explained by the court.

Since 1698 South Carolina has had recording acts. *See Epps v. McCallum Realty Co.,* 139 S.C. 481, 497, 138 S.E. 297, 302 (1927). Notwithstanding this long established provision for recordation, the state has cited no case holding that proof of recording in the Registry of Mesne Conveyances is necessary in order to establish legal title within the meaning of section 15–67–210. This lack of precedent is not surprising because "recording becomes material only when there are double conveyances by the same person, or where there are subsequent creditors." *First Carolinas Joint Stock Land Bank v. Hudgens,* 171 S.C. 18, 21, 171 S.E. 449, 451 (1933). Neither of these situations is involved in this case.

Because the South Carolina legislature recognized in section 27–15–30 that the 1764 survey of Catawba lands was duly filed, we conclude that based on its precedents the Supreme Court of South Carolina

would hold that the tribe's claim to legal title for the purpose of invoking the presumption provided in section 15–67–210 is not defeated by lack of recording in the Registry of Mesne Conveyances.

## IV

The state also argues that the tribe lacks legal title because Indian title cannot be alienated except by Act of Congress. Without the ability to alienate the tract of fifteen square miles, the state argues the Indians had only equitable, not legal, title.

The state's argument requires us to examine the relationship of the United States as a guardian or trustee for the tribe particularly with respect to the nature of the tribe's Indian title. In *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667–68, 94 S.Ct. 772, 777–78, 39 L.Ed.2d 73 (1974), the Court succinctly stated the nation's policy with respect to lands occupied by Indians:

> It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States. The Federal Government took early steps to deal with the Indians through treaty, the principal purpose often being to recognize and guarantee the rights of Indians to specified areas of land.... The United States also asserted the primacy of federal law in the first Nonintercourse

Act passed in 1790, 1 Stat. 137, 138, which provided that "no sale of lands made by any Indians ... within the United States, shall be valid to any person ... or to any state ... unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." This has remained the policy of the United States to this day.

■ The original 13 states hold the underlying fee simple title for lands subject to Indian title within their respective borders. *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 139–43, 3 L.Ed. 162 (1810). Elsewhere the United States holds fee simple title. But this naked fee gives the holder no possessory interest in the land. It constitutes merely a reversionary interest until Congress extinguishes the Indian title.[6] Congress's exclusive right to extinguish Indian title results from its trust relationship over Indian tribes. F. Cohen, *Handbook of Federal Indian Law*, 489 (1982 ed.). The federal trust relationship over Indian tribes is derived from the constitutional power conferred on Congress to regulate commerce with the Indian tribes and to make treaties. U.S. Const. art. I, § 8, cl. 3; art. II, § 2, cl. 2; *see McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 172 n. 7, 93 S.Ct. 1257, 1262 n. 7, 36 L.Ed.2d 129 (1973); F. Cohen, *Handbook of Federal Indian Law*, 207–12 (1982 ed.).

In *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 574, 5 L.Ed. 681 (1823), Chief Justice Marshall described a tribe holding Indian title "as the rightful occupants of the soil, with a legal as well as just claim to retain possession of it." Because only the United States could extinguish the tribal right, a conveyance by the tribe without the assent of the United States was inoperative. *Johnson*'s principles, as developed in subsequent decisions, indicate that "Indian title represents a perpetual right of use and occupancy (until extinguished) virtually equivalent to a fee interest against all but

---

6. In 1838, South Carolina transferred its reversionary interest in the tribe's land to lessees of the land. *See* § 27–15–30. This reversionary interest, conditioned upon the United States extinguishing the tribe's Indian title, is so remote that, like a possibility of reverter, it does not rise to the dignity of an estate. *See Adams v. Chaplin*, 10 S.C.Eq. (1 Hill) 265, 277 (1833).

the United States." F. Cohen, *Handbook of Federal Indian Law* 488, 489 (1982 ed.).

*Johnson* dealt with aboriginal land, but the Court has applied similar principles to lands that were the subject of grants or reservations by the crown. In *Mitchel v. United States*, 34 U.S. (9 Peters) 711, 9 L.Ed. 283 (1835), the Court recognized Indian title that originated in royal grants. Speaking of rights conferred on the Indians, the Court said that "it is enough to consider it as a settled principle, that their right of occupancy is considered as sacred as the fee-simple of the whites." 34 U.S. (9 Peters) at 746.

Again, in *United States v. Shoshone Tribe*, 304 U.S. 111, 117, 58 S.Ct. 794, 798, 82 L.Ed. 1213 (1938), the Court said: "Although the United States retained the fee, and the tribe's right of occupancy was incapable of alienation or of being held otherwise than in common, that right is as sacred and as securely safeguarded as is fee simple absolute title."

In *United States v. Tillamooks*, 329 U.S. 40, 46, 67 S.Ct. 167, 170, 91 L.Ed. 29 (1946), the Court reiterated: "As against any but the sovereign, original Indian title was accorded the protection of complete ownership; but it was vulnerable to affirmative action by the sovereign, which possessed exclusive power to extinguish the right of occupancy at will." But termination at will does not leave a tribe wholly unprotected. The Court held:

> The power of Congress over Indian affairs may be of a plenary nature; but it is not absolute. It does not "enable the United States to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation for them."

329 U.S. at 54, 67 S.Ct. at 174.

In *United States v. Kagama*, 118 U.S. 375, 381, 6 S.Ct. 1109, 1112, 30 L.Ed. 228 (1886), the Court observed: "The relation of the Indian tribes living within the borders of the United States, both before and since the Revolution, to the people of the United States has always been an anomalous one and of a complex character." Perhaps in no other context is this anomaly more apparent than the government's trusteeship of Indian lands. Indian title is not a common garden variety equitable title entirely governed by the precepts of chancery. It is a title derived from aboriginal possession subject to the right of discovery and conquest and in many instances, as here, dignified by royal grant. "The rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent apply in all the States, including the original 13." *Oneida*, 414 U.S. at 670, 94 S.Ct. at 778. The Court has instructed that the Indians' right of occupancy is to be "as securely safeguarded as is fee simple absolute title." *Shoshone*, 304 U.S. at 117, 58 S.Ct. at 798. Indian title confers on a tribe occupying the soil "a legal as well as just claim to retain possession of it." *Johnson*, 21 U.S. (8 Wheat.) at 574. A legal claim presupposes a legal title. Chief Justice Marshall did not speak of an equitable claim based on equitable title. These precedents establish that as a matter of federal law, for the purpose of recovering possession of real property and damages against any defendant other than the United States, Indian title is equivalent to fee simple absolute title. It is legal title.

The argument that the Catawbas have equitable title precluding the tribe from invoking the presumption afforded by section 15–67–210 conflicts with the policy of the United States and the Nonintercourse Act. This policy and the Act protect Indian tribes in their rightful occupancy of their lands. To use the trusteeship created by the Constitution and implemented by the Act to defeat a tribe's right of occupancy would indeed be ironic and unjust. Serious issues involving the application of the Supremacy Clause and the Equal Protection Clause would arise if a state in violation of the Nonintercourse Act were to dispossess a tribe and then defeat a tribe's legal claim to possession by denominating its title as equitable. Fortunately, we need not address these constitutional issues because we have no doubt that the Supreme Court of South Carolina, taking cognizance of

federal precedents and its own precedents, would hold that section 15–67–210 entitles the tribe to the presumption of possession.

### V

Having determined that the tribe's Indian title is legal title within the context of section 15–67–210, we must next decide the effect of the statutory presumption of possession on the rights of the tribe and the rights of the present occupants.

Standing alone South Carolina's 10–year statute of limitations would bar the tribe's claim.[7] This is the basis of the district court's opinion, and it is the position urged by the state. Section 15–3–340 provides:

> No action for the recovery of real property or for the recovery of the possession thereof shall be maintained unless it appear that the plaintiff, his ancestor, predecessor or grantor, was seized or possessed of the premises in question within ten years before the commencement of such action.

But the 10–year statute cannot be read in isolation. It must be read in conjunction with section 15–67–210. This section provides:

> In every action for the recovery of real property or the possession thereof the person establishing a legal title to the premises shall be presumed to have been possessed thereof within the time required by law. The occupation of such premises by any other person shall be deemed to have been under and in subordination to the legal title unless it appear that such premises have been held and possessed adversely to such legal title for ten years before the commencement of such action.

This section is applicable to the tribe's claim. It brought an action to recover possession of real property. It has legal title to the property. Consequently, it is "presumed to have been possessed thereof within the time required by law." What time? The 10 years specified in section

15–3–340 that is a prerequisite for bringing an action for the recovery of real property. Therefore, the plain text of sections 15–3–340 and 15–67–210 authorizes the tribe to maintain its action to recover possession of their tribal lands.

The state, however, contends that inasmuch as the tribe acknowledges that it has not been in possession of the land since 1840, this judicial admission precludes it from relying on the presumption. It relies on the axiom that a presumption must give way to reality when a fact is shown, and for this proposition it cites cases that do not discuss section 15–67–210.[8]

The difficulties with the state's argument are several. The tribe never admitted that it is not entitled to the presumption of possession. It has steadfastly maintained that its legal title enables it to claim possession for the necessary 10 years to maintain this action.

Section 15–67–210 does not require a plaintiff to show both legal title and possession, and we decline to place such a gloss on the statute. True, the presumption of possession is not conclusive. It can be rebutted, and the statute expressly states how it can be rebutted. Rebuttal may be accomplished according to the terms of the statute by showing "such premises have been held and possessed adversely to such legal title for ten years before the commencement of such action." The statute does not allow rebuttal by simply showing that the plaintiff has not been in possession or that the plaintiff has admitted lack of possession.

The tribe's position is sustained by *Love v. Turner,* 71 S.C. 322, 51 S.E. 101 (1905). In that case the plaintiff claimed title to a 100–acre tract by a grant from the state, subsequent deeds, and a will. The defendant denied the plaintiff's title and pled the statute of limitations and adverse possession, claiming title through a sheriff's deed and subsequent deeds. Judgment was en-

---

7. South Carolina also recognizes a 20–year presumption of grant doctrine and a 40–year statute of repose, § 15–3–330. But these are not an issue in this case.

8. *See, e.g., Galpin v. Page,* 85 U.S. 350, 366, 21 L.Ed. 959 (1873); *Fouche v. Royal Indemnity Co. of New York,* 217 S.C. 147, 60 S.E.2d 73 (1950); *Kaylor v. Hiller,* 77 S.C. 393, 58 S.E. 2 (1907).

tered for the plaintiff, and the defendant assigned error to the trial court's refusal to give the following charge:

> If neither the plaintiff nor any one under whom he claims title to the land in dispute has been seized or possessed of the land in question within ten years before the alleged acts of trespass were committed, then the plaintiff cannot recover.

71 S.C. at 330, 51 S.E. at 104. Ruling on this assignment of error, the Supreme Court said:

> If plaintiff had the legal title, he was presumed to be possessed of the land within the ten years, and it was necessary to rebut this presumption by proof of continuous adverse possession of some other person for ten years. The request embodying the foregoing proposition was, therefore, properly refused. (citations omitted)

71 S.C. at 330, 51 S.E. at 104. It should be noted that the charge, which the defendants sought and the court properly refused, is similar to the proposition the state asserts in the instant case. The court's ruling reflects the position of the tribe.

Similarly in *Crotwell v. Whitney*, 229 S.C. 213, 92 S.E.2d 473 (1956), the Court applied the predecessor of section 15–67–210 without the gloss that the state now seeks. In *Crotwell*, the plaintiffs founded their claim to title upon a deed executed by their father. The defendants claimed under a tax deed, adverse possession, presumption of a grant, and laches. The trial court entered judgment for the plaintiffs, and the Supreme Court affirmed, holding:

> Plaintiffs having established their legal title to the premises, appellant Whitney's claim of title by adverse possession required proof of actual, open, notorious, hostile, continuous and exclusive possession by him, or by one or more persons through whom he claimed, for the full statutory period of ten years, without tacking of possession except by descent cast.

229 S.C. at 220–21, 92 S.E.2d at 477. Again, the Court's construction of the statute is precisely that which the tribe asserts should be applied to its claim.

In *Crotwell*, the Court cited as authority *Haithcock v. Haithcock*, 123 S.C. 61, 115 S.E. 727 (1923), a case on which both parties rely. The plaintiff in *Haithcock* alleged title to 37 acres. The defenses were a general denial, adverse possession for 35 years, and the statute of limitations for 10, 20, and 30 years. The plaintiff prevailed, and the defendant appealed, assigning numerous errors. The Supreme Court affirmed. It held that the charge was correct and ordered that it be reported. Thus, the precedent established by the case is set forth in the charge.

The trial court explained to the jury that a man may obtain title by grant. It said:

> The title to all land was originally in the state, in the sovereign, or, prior to the Revolution, in the crown of England —and that is called the source of all title, in the state. So the first way in which a man may establish title to land is by showing a grant from the state, the source of all title, to himself, or a grant from the state to some one, and then by successive deeds, down to him. That is called a perfect legal paper title, a deed to himself, and then tracing back to some one else and to some one else, until it reaches the state, and then a grant from the state to the first holder of the land.

123 S.C. at 66–67, 115 S.E. at 729. This is precisely the way the tribe obtained title— by a grant from the English Crown before the Revolution. By well established law, and as a matter of fact, South Carolina recognized the grant.

The *Haithcock* trial court then explained how a defendant can defeat title. As a part of its charge it explained the 10–year statute of limitations now codified as section 15–3–340 upon which the state relies. The state quotes the following extract of the charge to establish its position:

> [The defendant] may defeat the plaintiff's title by showing that the plaintiff himself has not been in possession for 10 years next before the beginning of this action; for, gentlemen, the law makes possession a very strong factor in the question of title to real estate, and it says that if a man stays out of posses-

sion for 10 years, asserts no claim to a piece of property, does not occupy it by himself or tenants, and lets that situation remain for 10 years, the law says that it is too late for him to come in, that he is barred by the statute of limitations, and having slept on his rights for as long as 10 years, he cannot come in afterwards and assert his rights.

123 S.C. at 69, 115 S.E. at 729. Taken in isolation out of context this extract from the charge would seem to support the state. But it does not. For in the next paragraph of the charge, which the state omitted to quote, the Court explained that possession could be established by the presumption that is now codified as section 15–67–210 upon which the tribe relies. The Court said:

Now, what is possession of land? I charge you that, under the law, if one shows paper title—a deed or will or legal paper title of any kind, to land—then the law presumes that he was in possession of that land, and that his title gives him the possession; that is, the possession follows the title. Perhaps I had better read you what the statute says on that question. Now, pay attention to this, because this is the act of the Legislature, and is the law that governs us all: "In every action for the recovery of real property, or the possession thereof, the person establishing a legal title to the premises shall be presumed to have been possessed thereof within the time required by law; and the occupation of such premises by any other person shall be deemed to have been under and in subordination to the legal title, unless it appear that such premises have been held and possessed adversely to such legal title for 10 years before the commencement of such action." Code Civ. Proc. 1912, § 126.

In other words, gentlemen, the law presumes, where a man shows title, he need not be on the land, he need not be in 10 miles of the land, if he shows perfect legal title, then the law says the possession follows the title, and he is deemed to be in possession if he show a good legal title to the land, although he may never

have seen the land; and that presumption holds unless, and until, some one else goes on the land and occupies and holds it adversely to that right for 10 consecutive years.

123 S.C. at 69–70, 115 S.E. at 729–30. It is quite apparent that the trial court's charge, approved by the Supreme Court of South Carolina, expressly refutes the state's argument. It is difficult to envision how a plaintiff who has "not been in 10 miles of the land" or who "may never have seen the land" could satisfy the state's argument that he must also be in possession of the land for 10 years. The correct analysis of the law, as the trial court lucidly explained in *Haithcock,* is that legal title without actual possession will satisfy the statutory presumption of possession.

We conclude that the tribe is entitled to invoke the presumption set forth in section 15–67–220, and its claim is not barred because it acknowledged that it did not actually possess the land for the 10 years specified in section 15–3–340.

## VI

■ The second sentence of section 15–67–210 defines both the status and the rights of the present occupants. The first clause provides: "The occupation of such premises by any other person shall be deemed to have been under and in subordination of the legal title...." This clause without more would defeat the state's claim, for permissive possession is not adverse. *Haithcock,* 123 S.C. at 84, 115 S.E. at 734. But the clause is subject to this important proviso, "unless it appear that such premises have been held and possessed adversely to such legal title for ten years before the commencement of such action." This proviso would appear to doom the tribe's claim, because this action was not commenced until 1980. But South Carolina's tacking doctrine forestalls this conclusion.

The doctrine is succinctly stated by David H. Means, Professor of Law, University of South Carolina, as follows:

The rule in this State, contrary to the view of the overwhelming majority of jurisdictions, is that even though there be privity by deed or devise between successive adverse occupants of land, the possession of such occupants cannot be tacked to make out title by adverse possession under the statute of limitations. Such tacking has been permitted, however, in the case of a continuation by the heir of the possession of the ancestor dying intestate. (footnotes omitted)

D. Means, Survey of South Carolina Law: Property, 10 S.C.L.Q. 90 (1957).

*Ellen v. Ellen,* 16 S.C. 132, 141 (1881), explains the reason tacking is prohibited:

[A]n adverse possessor is a trespasser from the beginning to the end. His possession begins in trespass, and so continues until it ripens into a right at the end of the statutory period of ten years. During this time he has nothing that he can convey; nor can his possession be tacked with that of his grantee so as to defeat the title of the true owner.

In contrast, an heir can tack the possession of his ancestor dying intestate "upon the theory that there is no new entry or trespass, but that the possession of the ancestor is cast by operation of law upon the heir, hence there is no break in the continuity of possession." *Burnett v. Crawford,* 50 S.C. 161, 166, 27 S.E. 645, 647 (1897).[9]

South Carolina's prohibition against tacking applies to both a plaintiff who seeks to establish title by 10 years of adverse possession and a defendant who asserts the 10–year statute of limitations, section 15–3–340, as a defense. *See, e.g., Haithcock,* 123 S.C. at 75, 115 S.E. at 731 (plaintiff); and *Crotwell,* 229 S.C. at 221–22, 92 S.E.2d at 477–78 (defendant).

Application of South Carolina's tacking doctrine precludes the tribe from prevailing against a person who owns property that has been held adversely for 10 years in the relevant period of time without tacking except by inheritance. Conversely, a person who must rely on prohibited tacking cannot prevail against the tribe.

## VII

In view of the dissent's concern, a brief explanation of the district court's jurisdiction is appropriate. In paragraph 2 of its complaint, the tribe invoked jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1337 (an action or proceeding arising under an act of Congress regulating commerce), and § 1362 (claim asserted "by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."). In paragraph 3, the tribe alleged that its claims for relief arise under the Treaty of Pine Tree Hill, the Treaty of Augusta, Article I, Section 8 and Article VI of the Constitution (Commerce Clause and Supremacy Clause), and 25 U.S.C. § 177 (the Indian Nonintercourse Act).

On the basis of the facts assumed for the purpose of considering the summary judgment motion, which the state filed, there is no suggestion that the district court would have lacked jurisdiction to decide the tribe's claim if the tribe had brought its action before the passage of the Catawba Act in 1962. The question, therefore, is to what extent Congress intended the Catawba Act to affect the tribe's claim. In *South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. at 510, 106 S.Ct. at 2046, the Supreme Court answered this question, saying:

We do not accept petitioners' argument that the Catawba Act immediately extinguished any claim that the Tribe had before the statute became effective. Rather, we assume that the status of the claim remained exactly the same immediately before and immediately after the effective date of the Act, but that the Tribe thereafter had an obligation to proceed to assert its claim in a timely man-

---

**9.** Tacking is permitted when a claim or defense is founded on the 20–year presumption of a grant or on the 40–year statute of repose. D.

Means, Survey of South Carolina Law: Property, 10 S.C.L.Q. 90, n. 2 (1957).

ner as would any other person or citizen within the State's jurisdiction.

The Court's explanation establishes that, with the exception of the application of the state statute of limitation, Congress intended that every element of the tribe's claim "remained exactly the same immediately before and immediately after the effective date of the Act." The tribe's capacity to invoke federal jurisdiction pursuant to 28 U.S.C. §§ 1337 and 1362 was not defeated by the enactment of the Catawba Act.

Section 1331 provides another independent basis for jurisdiction. This section gives district courts jurisdiction of "all civil actions arising under the Constitution, laws, or treaties of the United States." The tribe's complaint alleged a right of occupancy under treaties with the British Crown that were implemented by the Nonintercourse Act. These allegations of Indian title sufficed to satisfy the well-pleaded complaint rule.

The tribe's allegations distinguish the case from *Taylor v. Anderson*, 234 U.S. 74, 34 S.Ct. 724, 58 L.Ed. 1218 (1914), where federal jurisdiction was lacking. In that case the plaintiffs did not allege Indian title, but only that the defendant's title was void because of an Act restricting alienation of Choctaw and Chickasaw allotments. The distinction is fully explained in *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), which held that a complaint alleging right of occupancy based on Indian or aboriginal title protected by the Nonintercourse Act established jurisdiction under section 1331. *Oneida* explained that the right to possession under a claim of Indian title is based on federal law. Therefore, the federal issue does not arise solely in anticipation of a defense. *Oneida* also reiterated that Indian title is a matter of federal law and that it can be extinguished only with federal consent. 414 U.S. at 666–74, 94 S.Ct. at 776–81. In *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. at 510, 106 S.Ct. at 2046, the Court held that the Catawba Act did not extinguish the tribe's claim of Indian title.

Many federal issues remain to be tried on remand, and the tribe may ultimately lose its case. Nevertheless, here, as in *Oneida*, the tribe's assertion of a federal right of occupancy governed by federal law is not "so devoid of merit as not to involve a federal controversy within the jurisdiction of the district court." 414 U.S. at 666, 94 S.Ct. at 776. The principles explained in *Oneida* demonstrate that the tribe's complaint did not run afoul of the well-pleaded complaint rule.

We conclude that sections 1331, 1337, and 1362, and each of them, confer jurisdiction on the district court. Moreover, the Supreme Court has definitively decided the effect that Congress intended the Catawba Act to have on the tribe's claim. On this issue its decision is final. We are not at liberty to attribute to Congress a different intention in order to question jurisdiction. The Supreme Court has issued its mandate directing us to decide the issue pertaining to the state statute of limitations. *See* 476 U.S. at 511, 106 S.Ct. at 2046. Sound principles of appellate procedure counsel compliance with the Court's mandate. *See Skillern's Ex'rs v. May's Ex'rs*, 10 U.S. (6 Cranch) 267, 3 L.Ed. 220 (1810).

## VIII

We hold that sections 15–3–340 and 15–67–210 bar the tribe's claim against each person who holds and possesses property that has been held and possessed adversely for 10 years after July 1, 1962, and before October 20, 1980, without tacking except by inheritance, in accordance with South Carolina's tacking doctrine. The statutes of limitations do not bar the tribe's claim against other persons. "Person" includes joint tenants, tenants in common, partnerships, associations, and corporations.

The judgment of the district court is affirmed in part and reversed in part, and this case is remanded for further proceedings consistent with this opinion. Each party shall bear its own costs.

WIDENER, Circuit Judge, dissenting:

Although I join in Judge Hall's dissent, I write separately to add a few words.

First, the Supreme Court has not hesitated to dismiss actions on grounds akin to jurisdictional even after prolonged litigation. In *Hughes Tool Co. v. Trans World Airlines*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), the Court dismissed the action, finding that the defendant's actions were immune from the antitrust laws. The dismissal took place some eleven years after the suit began and seven years after the Supreme Court had the opportunity to address the same issue and did not.[1] *Hughes Tool Co.*, 409 U.S. at 392, 93 S.Ct. at 663 (Chief Justice Burger dissenting). Merely because the Catawbas' suit has been in the court system for some time and the Supreme Court has addressed the suit without explicitly considering jurisdiction is no reason to shy away from the jurisdictional issue. *Hagans v. Lavine*, 415 U.S. 528, 534–35 n. 5, 94 S.Ct. 1372, 1378 n. 5, 39 L.Ed.2d 577 (1974).

Second, I see no reason why the presumption of possession relied upon by the Catawbas to save their action from South Carolina's statute of limitations is not rebutted by the Catawbas' judicial admission that they had been out of possession for 140 years when they filed suit. Although there are no South Carolina cases, similar presumptions in other States have been subject to rebuttal. See *Beneficial Life Ins. Co. v. Wakamatsu*, 75 Idaho 232, 270 P.2d 830 (1954). In *Kirkman v. Holland*, 139 N.C. 185, 51 S.E. 856, 857 (1905), the court would not even consider the presumption of possession arising from a statute indistinguishable from the one at issue here, given a judicial admission rebutting

it. In South Carolina, the "allegations, statements or admissions contained in a pleading are conclusive as against the pleader." *Elrod v. All*, 243 S.C. 425, 134 S.E.2d 410, 416 (1964). In their complaint, the Catawbas admit being out of possession since 1840. The presumption of possession in favor of the Catawbas, assuming arguendo that they have "legal title," has therefore been rebutted. The majority's approach, not permitting the defendants to rebut the presumption of possession once legal title is established (except by adverse possession), defeats the very purpose of South Carolina's statute of limitations by allowing a stale claim. If South Carolina had intended to give parties who could establish "legal title" *no* time limit to file suit, it could have done so instead of merely creating a presumption of possession. Civil presumptions in South Carolina are usually rebuttable. *Palm v. General Painting Co. Inc.*, 296 S.C. 41, 370 S.E.2d 463, 466 (1988) (presumption of legitimacy when born in wedlock); *McDowell v. S.C. Dept. of Social Services*, 296 S.C. 89, 370 S.E.2d 878, 880 (App.1987) (presumption of gift to a close relative); *Touchberry v. City of Florence*, 295 S.C. 47, 367 S.E.2d 149, 150 (1988) (presumption that public contract not enforceable by an individual as third party beneficiary); *Mathias v. Hicks*, 363 S.E.2d 914, 916 (S.C.App.1987) (presumption that collateral is worth indebtedness); *Woods v. Bivens*, 292 S.C. 76, 354 S.E.2d 909, 911 (1987) (presumption that possession of one tenant in common is possession by all); *Estate of Mason v. Mason*,

---

1. In 1964, the Supreme Court granted certiorari, but, after oral argument and briefing, which included the issues upon which the case was ultimately decided, in 1965 dismissed the writ as improvidently granted. *Hughes Tool Co.*, 409 U.S. at 391–92, 93 S.Ct. at 662–63. The Court nevertheless did not hesitate to dismiss the suit on the same grounds in 1973 when the case was there a second time.

I have used the words "akin to jurisdictional" in an abundance of caution and out of deference to the Court in *Hughes Tool* which stated that the Federal Aviation Act did not "completely replace" the antitrust laws. Of course if *Hughes Tool* is not purely jurisdictional, it is an even stronger precedent for my point of view than a case decided on a question relating purely to subject matter jurisdiction. In this respect, I note that the Second Circuit, in an earlier appeal in this same case, *Trans World Airlines v. Hughes*, 332 F.2d 602 (2d Cir.1964), treated the question as jurisdictional and that Sullivan in his treatise, *Antitrust*, West 1977, p. 746, et seq, considers the question one of primary jurisdiction. I also note that the Court in *Hughes Tool*, 409 U.S. at 364, 365, n. 1, 93 S.Ct. at 650, n. 1, as precedent for proceeding as it did, relied on *Indianapolis v. Chase National Bank*, 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed. 47 (1941), in which case a question of jurisdiction which had been presented to the Court, but not decided, was later decided upon subsequent consideration by the Court.

289 S.C. 273, 346 S.E.2d 28, 31 (App.1986) (presumption that a missing will was destroyed by testator); *McBride v. Atlantic Coast Line R. Co.*, 140 S.C. 260, 138 S.E. 803, 807 (1927) (presumption that when railroad fails to use warning signals that the failure is proximate cause of injury); *McMillan v. General American Life Ins. Co.*, 194 S.C. 146, 9 S.E.2d 562, 574–75 (1940) (presumption against suicide). Logic and South Carolina precedent require, I think, the conclusion that the presumption of possession created in S.C.Code § 15–67–210 is also rebuttable and has been rebutted in this case by the admission of the Catawbas.

Circuit Judge HALL, joins in this dissent.

HALL, Circuit Judge, dissenting:

As an intellectual exercise, I disagree with the majority's analysis of South Carolina law as it relates to the Catawbas'

duty to assert their claim within ten years of the Tribe's 1962 dissolution. In my view, either the removal of disability provision of S.C.Code § 15–3–370 [1] or the more general statute of limitations in S.C.Code § 15–3–340 [2] would effectively bar the Catawbas' instant possessory action. My principle objection to the majority's decision is more fundamental, however. In light of the Supreme Court's discussion of the effect of the Catawba Indian Tribe Division of Assets Act, 25 U.S.C. §§ 931–938 in *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986), and the well-established jurisdictional doctrine of *Taylor v. Anderson*, 234 U.S. 74, 34 S.Ct. 724, 58 L.Ed. 1218 (1914), I am persuaded that federal jurisdiction over the Catawbas' claim has never existed.

In the original complaint, the Catawbas sought to invoke federal jurisdiction on three bases: (1) federal question pursuant

1. The majority mechanically rejects any role for § 15–3–370 on the ground that it specifically applies only to minors, mental incompetents, and prisoners. The majority fails to recognize, however, that the statute was broadly written to cover all classes of citizenry normally assumed to be under a legal disability. See 51 *Am.Jur.2d*, Limitations of Action §§ 178 *et seq.* Although the South Carolina legislature did not expressly provide for Indians, it clearly did intend that any South Carolina citizen whose legal status excused a timely assertion of legal rights would pursue those rights within ten years of a change in that status. The Catawbas' action, in my view, falls within the broad intent of the statute by analogy and should be barred for that reason.

2. In reasoning that Indian title is legal title conferring a presumption of possession under § 15–67–210 and, thereby defeating the ten-year statute of limitations provided in § 15–3–340, the majority has permitted an exception to devour the rule. South Carolina has clearly sought to impose finality in potential land disputes by requiring a party out of actual possession to bring an action within ten years. The only exception to that general rule is the presumption of possession accorded the holders of "legal title" by § 15–67–210. Logically, however, "legal title" must be some mechanism that would give adequate notice to another claimant that the statute of limitations is unavailable.

South Carolina law unquestionably treats recordable titles with special deference. South Carolina Code § 15–3–380 specifically provides

that a chain of title "by virtue of a written instrument" extending for forty years "shall be deemed valid against the world." In my view, the presumption of possession in § 15–67–210 is a product of the same rationale that produced § 15–3–380. Although it has not been expressly asserted on appeal, I am convinced that the present South Carolina landholders, who undoubtedly have chains of title exceeding forty years, are entitled to prevail under 15–3–380 and to defeat the presumption of possession in § 15–67–210.

In reaching a contrary position, the majority has fallen into the morass created by careless language in older South Carolina property law decisions such as *Haithcock v. Haithcock,* 123 S.C. 61, 115 S.E. 727 (1923). In *Haithcock,* the term "title" is alternatively used to refer to a superior possessory interest as well as the legal indicia of that interest. Significantly, however, the court in *Haithcock* discussed the presumption of possession only in connection with a "paper title"—a recordable instrument. 123 S.C. at 69–70, 115 S.E. at 729–30. By focusing instead upon the four ways upon which a possessory interest in land can be validly obtained in South Carolina and granting to each a presumption of possession, the majority has created a statute of limitations that doesn't limit anyone except parties who could not prevail in any event. I find this interpretation of the South Carolina statute utterly irrational. I also find the failure to address § 15–3–380 particularly troubling in light of the extensive treatment of South Carolina law attempted in the majority opinion.

to 28 U.S.C. § 1331 [jurisdiction over "all civil actions arising under the Constitution, laws or treaties of the United States"]; (2) Indian tribe pursuant to 28 U.S.C. § 1362 [jurisdiction over "all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws or treaties of the United States"]; and (3) regulation of commerce pursuant to 28 U.S.C. § 1337 [jurisdiction over a civil action arising under "any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies"]. The last theory was advanced to support the allegation that an 1840 conveyance of the land at issue by the Catawbas was achieved in contravention of the 1799 Indian Nonintercourse Act, 25 U.S.C. § 177. The Supreme Court's decision in *Catawba* leaves no doubt, however, that neither section 1362 nor 1337 was ever a legitimate ground for federal litigation.

In *Catawba*, the Court quoted prominently from section 5 of the Catawba Act, which provides that:

> The constitution of the tribe adopted pursuant to sections 461, 462, 463, 464, 465, 466 to 470, 471 to 473, 474, 475, 476 to 478, and 479 of this title shall be revoked by the Secretary. Thereafter, the tribe and its members shall not be entitled to any of the special services performed by the United States for Indians because of their status as Indians, all statutes of the United States that affect Indians shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction. Nothing in this subchapter, however, shall affect the status of such persons as citizens of the United States.

Based on that provision, the Court clearly concluded that after the 1962 effective date of the Catawba Act, the trust relationship between the United States and the Catawbas was dissolved, the federal statutory protection for Indians was no longer applicable to them and the laws of South Carolina controlled their right, if any, to the land claimed in this case. *Catawba*, 106 S.Ct. at 2043.[3]

It is now beyond question that when the plaintiffs/appellees initiated their action in 1980 they were not Indians as that term is used in federal law. At most, the appellees are a collection of South Carolina residents of Indian descent who are successors in interest to a defunct tribe—a point expressly acknowledged by the Supreme Court when it described appellees as "a nonprofit corporation organized under the laws of South Carolina in 1975." 106 S.Ct. at 2040 n. 2. The essential jurisdictional prerequisite for 28 U.S.C. § 1362—an "Indian tribe . . . duly recognized by the Secretary of the Interior. . . ." was plainly absent.[4] Similarly, the dissolution of the Catawbas in 1962 undermined the jurisdictional validity of the Nonintercourse Act claim asserted under 28 U.S.C. § 1337. The continued existence of a trust relationship is required in order to invoke a Nonintercourse Act claim in federal court. *See e.g., Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1975).

Without sections 1362 or 1337, the only remaining ground on which appellees might assert federal jurisdiction is the general federal question provision of section 1331. A review of the history of this case reveals, however, that jurisdiction on that theory runs afoul of the long-established rule that a federal question must appear on the face of a "well-pleaded complaint." See Wright, Miller & Cooper, *Federal Practice and*

---

**3.** The Court's reasoning was supported prominently by citation to cases such as *Larkin v. Paugh*, 276 U.S. 431, 48 S.Ct. 366, 72 L.Ed. 640 (1928) (termination of trust relationship rendered consideration of land disputes appropriate in state courts, "the land being there.") *Catawba*, 106 S.Ct. 2045 n. 19.

**4.** The unavailability of section 1362 has particular significance in light of the fact that the State

of South Carolina is a named defendant. The statute abrogates a state's normally applicable immunity under the eleventh amendment. *Lac Courte Oreilles Band, etc. v. State of Wisconsin*, 595 F.Supp. 1077 (W.D.Wisc.1984). If section 1362 is, as I believe, inapplicable, the Catawbas' action against the State is constitutionally suspect.

*Procedure:* Jurisdiction 2d § 3566. The Catawbas' initial complaint, which asserted purely state claims for ejectment and trespass damages, failed that test. Indeed, federal law did not enter this case until it was belatedly asserted by the Catawbas in response to the defendants' attempted reliance upon South Carolina statutes of limitation.

The Supreme Court in *Taylor, supra,* unhesitatingly applied the well-pleaded complaint rule to defeat a possessory land claim advanced by individual Indians. The Indians had alleged that certain defendants were in possession of Indian land in violation of "legislation of Congress restricting the alienation of lands allotted to the Choctaw and Chickasaw Indians." 234 U.S. at 74–75, 34 S.Ct. at 724. The Court reasoned that federal jurisdiction was lacking since the action was one for ejectment and the allegations involving federal law were "neither essential nor appropriate." *Id.* In approving of the result in *Taylor,* modern commentators have agreed that an action for the possession of land does not arise under federal law simply because there is a potential federal issue in the chain of title. Wright, Miller & Cooper, *Id., see also* F. Cohen, *Handbook of Federal Indian Law,* 312 (1982 ed.).

The subsequent decision in *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), recognized an exception to the *Taylor* rule for possessory actions brought by an Indian tribe in a current trust relationship with the federal government. In circumstances where the land title is under "continuous" federal protection, the Court reasoned that a right of possession necessarily raises a federal question. *Id.* at 676–77, 94 S.Ct. at 781–82. I see nothing in *Oneida,* however, that would extend its reach to situations where there is no trust relationship that would indicate a "continuing federal interest" in the land in dispute. 414 U.S. at 683, 94 S.Ct. at 785, Rehnquist, J., concurring.[5] It follows, therefore, that the Catawbas, who unquestionably had no trust relationship with the United States, have asserted what must be seen as a purely state law cause of action falling squarely within the jurisdictional limitations of *Taylor v. Anderson.*

I, of course, recognize that it is late in the day to raise a jurisdictional objection to this prolonged litigation. It is also true that this Court, as did the district court below and the Supreme Court above, has addressed this case on the merits without examining the jurisdictional implications. This omission is in large part a result of the parties' failure to raise the issue. It cannot, however, relieve us of our fundamental responsibility to insure that we decide only those cases that fall within our lawful authority as a court of limited jurisdiction.

We certainly cannot assume that the Supreme Court's treatment of the merits in *Catawba* or even its remand of the state law issues to this Court amounts to a finding of jurisdiction. Jurisdiction was not specifically addressed in *Catawba.* Moreover, the Court itself has acknowledged on other occasions that the passing of a jurisdictional question *sub silentio* does not resolve that issue. *Hagans v. Lavine,* 415 U.S. 528, 534–35 n. 5, 94 S.Ct. 1372, 1378 n. 5, 39 L.Ed.2d 577 (1974). The existence of jurisdiction remains open for consideration when properly raised.

The implications of the majority's decision are profound. The ownership interests of over 25,000 South Carolina landowners will be impaired and in many cases overturned notwithstanding chains of title of previously unquestioned validity. If South Carolina law, which the Supreme Court has recognized as controlling, com-

---

5. Certainly the Supreme Court did not intend for its decision to "disturb the well-pleaded complaint rule of *Taylor v. Anderson,*" *Oneida,* 414 U.S. at 677, 94 S.Ct. at 782. Lower courts have also recognized that *Oneida* left *Taylor* intact. See *State of New York v. White,* 528 F.2d 336, 339 (2d Cir.1975) (concluding that *Oneida* was a "narrow ruling" based on the "unique relationship" between the federal government and Indian nations). In the present case, the "unique relationship" had obviously been terminated well before the litigation began. It is a clear failure to appreciate the interplay of *Taylor* and *Oneida,* as well as a serious misreading of *Catawba* that dooms the effort to assert jurisdiction in section VII of the majority opinion.

pels that result then so be it. It offends reason and justice, however, for the assessment of South Carolina law to be conducted by a court without jurisdiction and with no special familiarity with the relevant law.[6] I am persuaded that, today, we are such a court. Accordingly, I respectfully dissent from the majority's resolution of this matter.

---

**6.** The Supreme Court's remand of the state law issue in *Catawba* was based upon the traditional deference accorded the Courts of Appeals and the district courts to resolve state law issues arising within their jurisdictions. *E.g. Propper v. Clark,* 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949). That deference, however, is rooted in the assumption that at least some of the district and appellate judges involved are usually from the state where the legal question has arisen and, thus, are trained in that state's law. That situation is not present here where neither the district judge who originally heard this case nor any member of this appellate court is a South Carolina jurist. By bringing this case in federal court and proceeding against a broad range of commercial defendants thereby compelling the recusal of many members of this Court, the Catawbas have managed to have their state law case decided by a court with substantially reduced familiarity with South Carolina law.